Samuel David CROWE, Petitioner,

v.

William TERRY, Warden, Respondent.

No. CIV. 1:02–CV–2265ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2005.

1314

ORDER

EVANS, District Judge.

Ann Grunewald Fort, Amelia Toy Rudolph, Sutherland Asbill & Brennan, Robert L. McGlasson, II, Federal Defender Program, Atlanta, GA, for Plaintiff.

Susan Virginia Boleyn, Office of State Attorney General, Atlanta, GA, for Defendants.

This § 2254 death penalty case is before the Court on the parties' briefs ("Petitioner's/Respondent's Brief") filed as directed in this Court's previous Order. *Crowe v. Head,* 356 F.Supp.2d 1339 (N.D.Ga.2005) ("January Order"). Based on the reasoning set forth below, the Petition for Writ of Habeas Corpus is DENIED.

TABLE OF CONTENTS

I. Factual and Procedural Background ....................................... 1316

II. January Order ......................................................... 1317

III. Claims Reviewed on the Merits in 2000 State Habeas Petition—Ineffective
 Assistance of Counsel .................................................. 1318
 1. Original Indictment ................................................ 1319
 2. Mitigation ......................................................... 1319
 3. Forensic Testimony ................................................ 1322
 4. Closing Arguments ................................................. 1323
 5. Conflict of Interest ............................................... 1324
 6. Fee Disputes ...................................................... 1326
 7. Crime Reenactment ................................................ 1326

IV. Claims Raised on Direct Appeal and Barred in 2000 State Habeas Petition
 Under *Elrod* ......................................................... 1327
 1. Interference with Right to Counsel ................................. 1327
 a. Facts .......................................................... 1327
 b. Application .................................................... 1329
 2. Use of a Cleansed Indictment ...................................... 1332
 3. Unconstitutional Limits on Mitigation Evidence ...................... 1336
 4. Prosecutorial Misconduct .......................................... 1337
 a. Represented by Counsel ........................................ 1337
 b. Petitioner's Fifth Amendment Right ............................. 1338
 c. Right to Jury .................................................. 1340
 d. Religious References ........................................... 1341
 5. Suppression of Evidence ........................................... 1341
 a. Sheriff's Deputies' Reports .................................... 1341
 b. Failure to Seal the State's File or Conduct *in camera* Inspection of
 File .......................................................... 1342
 6. Acceptance of Petitioner's Guilty and *Alford* Pleas ............... 1343
 7. Admission of Pretrial Suppression Hearing Statement ................ 1343

V. Claims Barred by Georgia's Procedural Default Rule in 2000 State Habeas
 Petition .............................................................. 1344
 1. Prosecutorial Misconduct .......................................... 1344
 2. Suppression of Exculpatory Evidence ............................... 1345
 3. Juror Misconduct .................................................. 1346
 a. Premature Deliberations ........................................ 1346
 b. Bailiff's Comment .............................................. 1347
 c. Alternate Jurors ............................................... 1348

 4. Trial Counsel's Conflict of Interest ........................................1348
 5. Reenactment of the Crime and View of the Crime Scene ....................1348
 6. Errors in Jury Selection .........................................1349
 7. Improper Jury Instructions .......................................1350

VI. Claims Raised in 2002 State Habeas Petition ..............................1351
 1. Cruel and Unusual Punishment ....................................1351
 2. Equal Protection Violation ........................................1354

VII. Conclusion ................................................................1356

## I. Factual and Procedural Background

A complete factual and procedural history of the case is set forth in the January Order. *Id.* at 1341–47. A brief summary is included here. Samuel David Crowe ("Petitioner" or "Crowe") was arrested for the murder of Joseph Pala on March 3, 1988. Petitioner hired Michael Bergin ("counsel" or "Bergin") in April 1988 to defend him against his capital murder and armed robbery charges in Douglas County Superior Court. Crowe's mother agreed to pay Bergin $70,000 to represent her son.[1] Against Bergin's advice, Crowe entered a guilty plea[2] to the murder charge and an *Alford*[3] plea to the armed robbery charge on May 5, 1989. The trial court judge, Superior Court Judge Robert J. James, accepted Petitioner's guilty pleas. A jury subsequently found the existence of aggravating circumstances—Petitioner committed the murder during the course of an armed robbery and for the purpose of receiving money, and the murder was outrageously and wantonly vile, horrible or inhuman in that it involved depravity of mind and an aggravated battery—and sentenced Petitioner to death on November 18, 1989. Judge James imposed a life

sentence for the armed robbery charge on November 20, 1989.

Bergin filed a timely notice of appeal to the Georgia Supreme Court on December 8, 1989. Then, through new counsel, Michael Mears,[4] Petitioner filed an extraordinary motion for new trial on April 16, 1990. Crowe sought an evidentiary hearing to prove his grounds for a new trial. The trial court dismissed the motion on April 20, 1990. Crowe appealed from the dismissal of his extraordinary motion to the Georgia Supreme Court. The Court remanded the case to the Superior Court of Douglas County and ordered a hearing solely on the issues Petitioner raised in his extraordinary motion. Superior Court Judge David Emerson[5] held an evidentiary hearing on the motion on March 3, 1994. Judge Emerson denied the motion in a 31–page written order which made findings of fact and conclusions of law.

Mears filed a consolidated appeal on Petitioner's behalf in the Supreme Court of Georgia as to the entry of his guilty pleas, the imposition of the death penalty, and the denial of his extraordinary motion. The court rejected Crowe's challenges, affirmed his convictions and sentences, and affirmed the denial of the extraordinary

---

1. Bergin received $20,000 in cash. He accepted a deed for the remainder of his fee.

2. The Court notes Crowe's characterization of the plea as a "pro se" plea.

3. *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

4. Crowe was represented by Michael Mears and Nancy Mau Markle, Multi–County Public Defenders, during the hearing on the extraordinary motion for new trial (hereinafter "Mears").

5. Judge James had recused himself at Crowe's request.

motion for a new trial. *Crowe v. State*, 265 Ga. 582, 458 S.E.2d 799 (1995). The Supreme Court of Georgia denied Crowe's motion for reconsideration on July 17, 1995.

On December 8, 1995, Crowe's counsel filed a petition for a writ of certiorari with the United States Supreme Court, but it was denied on February 26, 1996. *Crowe v. Georgia*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). The Court denied Crowe's petition for rehearing on April 15, 1996. *Crowe v. Georgia*, 517 U.S. 1151, 116 S.Ct. 1455, 134 L.Ed.2d 573 (1996).

Petitioner then filed his first Petition for Writ of Habeas Corpus in the Superior Court of Butts County. The Honorable William M. Towson summarily rejected each of Petitioner's claims on July 10, 2002 ("Towson Order"). Petitioner's final state habeas petition was rejected by the Honorable Chief Judge E. Byron Smith on September 17, 2002 ("Smith Order").

## II. January Order

This Court's January Order reviewed each of the judicial proceedings leading up to Petitioner's instant habeas petition under the strictures of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. The Act states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254(d). Under the statute's "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by the federal court on a question of law, or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" from that of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court may violate the "unreasonable application" clause of § 2254(d)(1) in two ways: first, by identifying the correct governing legal principle from the Court's decisions, but unreasonably applying that principle to the facts of the prisoner's case, *id.* at 407, 120 S.Ct. 1495; second, by either unreasonably extending a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refusing to extend a legal principle to a context where it should apply. *Id.* More specifically, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. A court must keep in mind, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," *id.* at 410, 120 S.Ct. 1495, and only a decision that is both unreasonable and incorrect will warrant habeas relief. *Id.* at 411, 120 S.Ct. 1495. "If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody—or, as in this case, his sentence of death—violates the Constitution, that independent judgment should prevail." *Id.* at 389, 120 S.Ct. 1495.

The AEDPA also states that the state court's determinations of fact are "presumed to be correct," and the habeas petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). However, this statutory presumption of correctness applies only to findings of fact, not to mixed determinations of law and fact. *Parker v. Head,* 244 F.3d 831, 836 (11th Cir.2001) (citing *McBride v. Sharpe,* 25 F.3d 962, 971 (11th Cir.1994)).

Guided by the above principles, the January Order differentiated between those claims previously rejected based on state procedural grounds and thus not proper for review, and those rejected after a consideration of the merits and application of Federal law, which the Court reviews below. *See Crowe,* 356 F.Supp.2d at 1348–51.

### III. Claims Reviewed on the Merits in 2000 State Habeas Petition—Ineffective Assistance of Counsel

The state habeas court decided Petitioner's ineffective assistance of counsel claim entirely on the merits. After a thorough review, the court ultimately concluded that counsel's actions did not amount to a Sixth Amendment violation. This Court agrees that the state court's decision was neither "contrary to" nor did it "involve[ ] an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Judge Towson properly applied *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court precedent for claims of ineffective assistance of counsel, to Petitioner's claim. A habeas petitioner is entitled to habeas relief for ineffective assistance of counsel when (1) counsel's performance falls below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors

and omissions, the result of the proceedings would have been different. *Id.* at 687, 104 S.Ct. 2052.

Under the first prong, Petitioner must show first that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* The "petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment." *Brownlee v. Haley,* 306 F.3d 1043, 1059 (11th Cir.2002). This bar is very high.

If Petitioner establishes the first prong, he must then show that "the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense. . . . [There must be a] reasonable probability that the outcome would have been different." *Brownlee,* 306 F.3d at 1059 (quoting *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052).

In addition to satisfying *Strickland,* Petitioner must also show that, in rejecting his ineffective assistance of counsel claim, "the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby,* 385 F.3d 1300, 1309 (11th Cir.2004) (quoting *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)).

▮ In considering ineffective assistance claims, courts must remember to evaluate an attorney's performance from his or her perspective at the time of trial or sentencing phase,[6] not through hindsight. *Strickland,* 466 U.S. at 689, 104

---

**6.** *Grayson v. Thompson,* 257 F.3d 1194, 1215 (11th Cir.2001) (noting that *Strickland* applies

to guilt/innocence and sentencing phase of trial).

S.Ct. 2052; *Grayson,* 257 F.3d at 1216. Likewise, the court's determination should be based on "the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

■ Finally, although Petitioner's claims focus on what trial counsel could have or should have done, the law requires the court to look, instead, first to what the lawyer did in fact and determine whether those actions were reasonable. *Chandler v. United States,* 218 F.3d 1305, 1320 (11th Cir.2000) (en banc).

Based on the above, Petitioner claims that his counsel violated the *Strickland* standard, thereby depriving him of his Sixth Amendment right to effective assistance of counsel. Petitioner asserts several grounds to support his claim.

**1. Original Indictment**

■ Petitioner claims that counsel's failure to offer the guilty plea as mitigating evidence before the close of evidence was severely prejudicial. Petitioner claims his most persuasive mitigating evidence was the indictment showing his guilty plea, and because counsel failed to offer it into evidence, the jury likely viewed his mitigation claims as an attempt at misrepresentation. Petitioner's Brief, p. 37.

The evidence does not support Petitioner's conclusion. Judge Towson held, "the record shows that trial counsel did try to offer the guilty plea into evidence. In fact, trial counsel objected when the trial court decided not to send out the 'original' indictment. Trial counsel again tried to have original [sic] indictment submitted to rebut a presumption raised in the State's closing argument. It was not trial counsel's ineffectiveness which kept out this information ..." Towson Order, p. 41.

This Court presumes that Judge Towson's factual findings are correct and Petitioner has not put forth clear and convincing evidence otherwise. *See* 28 U.S.C.

§ 2254(e)(1). Counsel made several references to the fact that Petitioner pled guilty and adamantly objected to the jury not seeing the original indictment. *See* Transcript from Nov. 18, 1989, pp. 1823–31. Therefore, counsel's alleged failure to object to the jury not seeing the actual indictment is not grounds for ineffective assistance of counsel.

**2. Mitigation**

Petitioner claims counsel's failure to search for and introduce Petitioner's life history was fatal error because that information would have explained Petitioner's drug addiction and actions on the night he killed Mr. Pala.

The United States Court of Appeals for the Eleventh Circuit has held, although no absolute duty exists to investigate particular facts or a certain defense, "in preparing for a death penalty case, '[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'" *Grayson,* 257 F.3d at 1225 (quoting *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1994)). "However, counsel is not required to investigate and present all mitigating evidence in order to be reasonable." *Id.* (citing *Tarver v. Hopper,* 169 F.3d 710, 715 (11th Cir.1999)). The focus is not on "whether counsel should have presented a mitigation case. Rather, [courts should] focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Petitioner's] background *was itself reasonable." Wiggins v. Smith,* 539 U.S. 510, 522–23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (finding counsel's decision not to expand his investigation beyond the presentence investigation report ("PSI") and Department of Social Services ("DSS") records fell short of the American Bar Association ("ABA") and state professional

standards, which, at the time, included the preparation of a social history report). The decision is based on "the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527 (citing *Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495).

■ The Supreme Court also explained in *Wiggins,* "[i]n assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." 539 U.S. at 527, 123 S.Ct. 2527. This is because "'strategic choices made after a less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* at 533, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052).

■ In Petitioner's case, counsel hired a psychiatrist to evaluate Petitioner, provide observations, and determine whether Petitioner suffered from any mental deficiencies. The psychiatrist reported that no psychiatric defenses were available. Counsel also employed two investigative agencies to interview potential mitigation witnesses. Finally, counsel and investigators interviewed everyone Petitioner thought may be helpful in mitigation, including friends, family, co-workers, and former co-workers. Transcript from Jan. 28, 1999, p. 140. The final package consisted of sixteen mitigation witnesses, ranging from family members and co-

workers to previous supervisors and members of the prison ministry.

Counsel testified that Petitioner lied to him on several occasions, which made counsel's job very difficult for obvious reasons. *Id.* at 276–77. In fact, counsel testified that its theory of the case had to change several times because Petitioner's story kept changing. The situation became so difficult that counsel finally had Petitioner take a polygraph test to determine when and if Petitioner was telling the truth. Transcript from Mar. 3, 1994, p. 116.

Finally, Petitioner refused to allow counsel to pursue a psychological defense or hire further experts.[7] Based on this refusal, counsel claimed his strategy at the sentencing trial was to "humanize" Petitioner and thought presenting Petitioner as having a "sorry life" would backfire. *See* Transcript from Jan. 28, 1999, pp. 235, 248. According to counsel, Petitioner never indicated that drugs had anything to do with the crime, he did not think Petitioner had a drug addiction, and presentation of drug use to a jury was risky. *Id.* at 144. Counsel's conclusions were based on his opinion and experience that use of drug addiction and mental health experts were not good tactics because they, too, could "backfire" with a jury.[8] As for his family background, Petitioner never revealed any negative information about his family background and life history, even to the psychiatrist. No other signs pointed to a troubled background.

■ All of this evidence shows that counsel, in fact, did conduct a reasonable

---

7. Petitioner made it very clear by telling counsel, "flat out ... no more experts." Transcript from Jan. 29, 1999, p. 180.

8. Counsel's conclusion that Petitioner was not a drug addict is suspect. Experience as an attorney and police officer does not make

counsel qualified to gauge drug addiction. However, his refusal to call drug and mental health experts must be characterized as a trial tactic and as consent to Petitioner's demand that he not call more experts. *See* Transcript from Jan. 28, 1999, pp. 140, 144–45.

investigation into Petitioner's background, which is all that *Strickland* requires. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (stating that counsel has a duty to investigate to a reasonable extent). Given Petitioner's intelligence and participation in the defense, counsel's reliance on him was reasonable. The duty to investigate "does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense." *Rutherford,* 385 F.3d at 1313 (citing *Gilreath v. Head,* 234 F.3d 547, 550 n. 10 (11th Cir.2000) ("We readily conclude that trial counsel—by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence—did not perform in an unreasonable manner.")). *See also Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (When counsel has "reason to believe that pursuing certain investigations would be fruitless ... counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *Johnston v. Singletary,* 162 F.3d 630, 642 (11th Cir.1998) ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.") (internal marks and citations omitted); *Hance v. Zant,* 981 F.2d 1180, 1183–84 (11th Cir.1993) (finding that counsel's agreeing to capital defendant's wishes not to contact his family did not amount to ineffective assistance under the circumstances); *Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir.1986) ("[A] defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation."); *United States v. King,* 1997 WL 223057, at *3 (N.D.Ill.1997) (holding that because defendant did not present his trial attorneys with any concrete reason to suspect a conspiracy amongst family members, trial counsel should not be faulted for failing to investigate).

Based on all of the above, counsel's performance during mitigation cannot be deemed inadequate under *Strickland.* Therefore, an analysis of whether counsel's conduct prejudiced Petitioner's case is not necessary.

In the alternative, Petitioner contends that the state habeas court's decision was contrary to well established law because, "faced with materially similar facts, the state court came to a contrary conclusion than that reached by the U.S. Supreme Court." Petitioner's Brief, p. 33. Petitioner cites *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), as support for his position. However, *Kimmelman* is distinguishable from the instant action on many grounds.

*Kimmelman* involved counsel's failure to "litigate a Fourth Amendment claim competently." *Id.* at 375, 106 S.Ct. 2574. Counsel was unaware of evidence illegally seized from petitioner's home because he had failed to request *any* discovery from the prosecution. Counsel also prepared for trial under the mistaken beliefs that a request for inculpatory evidence was not necessary because the state was obliged to turn over all such evidence and that the victim's preference determined whether the state proceeded to trial following an indictment. *Id.* at 385, 106 S.Ct. 2574. In the instant action, Petitioner's counsel did not make any similarly egregious mistakes.

*Wiggins,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, is also distinguishable. There, the Supreme Court held that counsel was ineffective for not investigating further than the PSI and DSS reports as to petitioner's troubled childhood. Counsel subsequently failed to present *any* evidence of petitioner's life history or family background in spite of counsel's opening argument, which promised the jury that they would " 'hear that [petitioner] has had a difficult life ... [b]ut he's worked. He's

tried to be a productive citizen.'" *Id.* at 515, 123 S.Ct. 2527. Counsel's performance was unreasonable even in light of the heavy deference applied to counsel's performance because he neither investigated nor made a reasonable decision not to investigate. *Id.* at 515–16, 123 S.Ct. 2527.

In the instant action, counsel's decision not to investigate further into Petitioner's family history and background was reasonable given the lack of information that would have made such investigation necessary, Petitioner's participation in providing other mitigating witnesses, as well as Petitioner's request that counsel not contact any further experts.

### 3. Forensic Testimony

Petitioner also asserts as error counsel's cross-examination of several of the State's witnesses. He challenges Judge Towson's findings that trial counsel's failure to interview experts Byron Dawson and Kelly Fite was reasonable; counsel's failure to employ experts was reasonable; counsel's decision to not cross-examine the experts was reasonable; and experts Fite and Dawson did not testify outside the scope of their knowledge. Petitioner's Brief, p. 41.

■ In support of his claim that counsel's failure to interview and challenge the designation of experts Fite and Dawson is proof of ineffective assistance, Petitioner points to the ABA Guidelines, which serve as "guides to determine what is reasonable." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The guidelines state that trial counsel "must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Introduction (2003). Whether or not counsel's cross-examination was "effective" must be decided on a case-by-case basis.

In the instant action, with respect to Mr. Dawson, the State's medical examiner, counsel testified that he did not think it was tactically sound to discredit the expert's testimony when he was not able— per Petitioner's directions—to counter Mr. Dawson's testimony with his own expert's testimony. Doing as much would "leave[ ] something hanging and put[ ] more of a credibility strain on the case. . . . [a case where] you've got a man's life at stake who has confessed to the murder numerous times." Transcript from Jan. 28, 1999, pp. 181, 189.

As for Mr. Fite, a Georgia Bureau of Investigations officer, counsel had worked with him on several occasions, knew he was honest, and thought the time interviewing him before the hearing would be wasted because Mr. Fite would give the same testimony on the stand. *Id.* at 190. Counsel also explained that he was cautious as to which and how many objections he made because objecting often, having the jury excused frequently, and playing "technical defenses," could turn a jury off. *Id.* at 194. Petitioner states that counsel's conclusions were unreasonable.

Petitioner also claims that the physical evidence and forensic testimony were crucial to the State's proof of aggravating circumstances, which led to Petitioner's death sentence. This Court does not disagree. However, counsel's limitation of objections and his inability to rebut the State's experts with counter expert witnesses of his own were reasonable tactical decisions to which this Court must defer.

Furthermore, the state habeas court made a factual determination, presumed correct, *see* 28 U.S.C. § 2254(e), that neither Mr. Fite nor Mr. Dawson testified outside their area of expertise. *See* Towson Order, p. 44. Petitioner has not pre-

sented clear and convincing evidence otherwise.

■ Petitioner also argues that counsel's failure to present other experts, such as forensic pathologists, ballistics experts, crime scene reconstructionists, and other mental health experts is grounds for ineffective assistance of counsel. Even though Petitioner made it very clear, "flat out ... no more experts," *see* Transcript from Jan. 28, 1999, p. 180, he contends that counsel was ineffective because he never explained the importance of expert testimony or how each expert could contribute to his defense. Petitioner's Brief, p. 43. Petitioner does not cite any authority for this additional duty.

Petitioner also claims that his statement prohibiting the use of any more experts was only in reference to mental health experts. Counsel's failure to so interpret the statement when Petitioner did not give him any reason to do so was not unreasonable and not proof of his ineffectiveness.

Finally, Petitioner alleges that counsel's decision not to interview Warren Tillman and stipulate to his expert witness status are grounds for ineffective assistance of counsel. These decisions allegedly limited counsel's ability to effectively cross-examine him.

Mr. Tillman testified for the State that the paint found in the store and on Mr. Pala matched the paint found on Petitioner. Petitioner has not put forth any evidence that Mr. Tillman's testimony was improper or in any way prejudicial. Therefore, counsel's alleged failure to effectively cross-examine him is not grounds for habeas relief.

### 4. Closing Arguments

Petitioner claims that trial counsel unreasonably failed to object to the prosecutor's closing statement: "the Bible says that you shall be put to death if you kill somebody ..." *Crowe*, 458 S.E.2d at 811.

The Georgia Supreme Court held, and Judge Towson agreed, that the reference was a legitimate effort to counter the religiously affiliated witnesses Petitioner put forth, and that, even if the statements were improper, they did not change the result of trial. *Crowe*, 458 S.E.2d at 811.

■ In the Eleventh Circuit, "habeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair." *Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir.2001) (citing *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (1987) (en banc)); *Spivey v. Head*, 207 F.3d 1263, 1275 (11th Cir. 2000); *Drake v. Kemp*, 762 F.2d 1449, 1458 (11th Cir.1985) (en banc). "An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, ... which is to say that absent the argument the defendant would not have received a death sentence." *Romine*, 253 F.3d at 1366 (citing *Brooks*, 762 F.2d at 1401).

■ Based on this precedent, the Court's first step is to determine whether the prosecutor's statement was improper. *Id.* The phrase, "the Bible says that you shall be put to death if you kill somebody ...," is improper. Petitioner had already pled guilty and thus the jury's only task was to determine the proper sentence. The prosecutor's statement directly addressed this issue by relying on the Bible's alleged teaching that death is a mandatory penalty for murder. *Id.* (citing *Cobb v. Wainwright*, 609 F.2d 754, 755 n. 2 (5th Cir.1980) ("[T]he prosecutor made several

clearly objectionable ... remarks. For example, at one point in his argument, the prosecutor resorted to the Bible [and] told the jury that under its teachings there was no reason to show the defendants mercy.")). *See also Brooks,* 762 F.2d at 1410 ("Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required.").

Nonetheless, the statement did not render Petitioner's sentencing hearing unfair. To determine whether a sentencing proceeding is "unfair," the Eleventh Circuit applies a prejudice standard that asks if, absent the prosecutor's statements, there is a reasonable probability that the result would not have been a death sentence. *Romine,* 253 F.3d at 1366. In making this prejudice determination, the court must "examine the entire context of the judicial proceeding." *Id.* (citing *Brooks,* 762 F.2d at 1400).

While it is impossible to know whether the prosecutor's statements appealed to any one juror in particular, "[t]he possibility always exists that some jurors will be at least as impressed by Biblical authority as by the authority of a court or a legal scholar." *Id.* at 1368. On the other hand, *Romine* involved a case "saturated with evidence relating to religion ... [including] a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God, as the prosecutor interpreted it." *Id.* at 1369. Petitioner's case is distinguishable.

The prosecutor heavily relied on religion only during closing argument, and while

not appropriate, " 'isolated or ambiguous or unintentional remarks must be viewed with lenity.... [A] brief remark is less likely to cause prejudice.' " *Id.* (quoting *Brooks,* 762 F.2d at 1405). While the prosecutor's statements were improper and the trial court could have given a curative instruction about its applicability, the statement did not rise to the level of undermining confidence in the sentencing result.[9] The Court also notes that the issue of whether to object to an argument heavily implicates the judgment of counsel. Defense counsel may have believed that raising an objection would have been counterproductive. Indeed, defense counsel himself made Biblical references during his closing argument.

This Court concludes that counsel's failure to object to the prosecutor's remark was not unreasonable and that it did not prejudice Petitioner.

### 5. Conflict of Interest

 Petitioner also asserts that Bergin was ineffective because he was operating under a conflict of interest created by accepting funds from Petitioner's mother, rather than asking the State for financial assistance. Petitioner claims that counsel's acceptance of funds from Ms. Crowe kept him from conducting a full family history investigation for fear that Petitioner's mother would dismiss him or refuse to pay the balance of his fee if the "true nature of the mother-child relationship was [ ] explored." Petitioner's Brief, p. 49. Petitioner claims that Judge Towson's decision to the contrary was an unreasonable factual determination under § 2254(d)(2) because it ignored evidence that substance abuse was an issue at trial.[10] This Court disagrees.

---

**9.** Furthermore, any improper reliance on religion by the prosecutor must be compared with defense counsel's several religiously motivated references in mitigation. For example, counsel stated, "[t]he heart of the Bible—and I think it also comes from Matthew—is

forgiveness. That God—God can forgive any sin committed against man." Transcript from Nov. 18, 1989, p. 1844.

**10.** Petitioner also claims, "the decision that trial counsel had no duty to investigate family

In the Eleventh Circuit, a conflict of interest rises to the level of ineffective assistance of counsel when "a lawyer has inconsistent interests." *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999) (internal citations omitted). *See also Brownlee*, 306 F.3d at 1064. If Petitioner can show that his counsel operated under a conflict of interest, he must then show that the conflict "adversely affected" counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). In order to prove adverse effect, Petitioner must show (1) a plausible alternative defense strategy that counsel might have pursued; (2) that the alternative strategy was reasonable; and (3) some link between the actual conflict and the decision to forego that strategy. *Brownlee*, 306 F.3d at 1064 n. 17 (citing *Freund*, 165 F.3d at 860). Petitioner cannot satisfy the third prong.

Payment by a third party does not, per se, create an actual conflict of interest as defined in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *See Devaney v. United States*, 47 F.Supp.2d 130, 133 (D.Mass.1999) (citing Model Rule Prof. Conduct 1.8(f)); *Narvaez v. United States*, 1998 WL 255429 (S.D.N.Y.1998); *United States v. Zhadanov*, 1998 WL 633698 (E.D.Pa.1998); *King*, 1997 WL 223057.

In *Cuyler*, the Supreme Court explained that "until a defendant shows his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S. at 350, 100 S.Ct. 1708. In the instant case, Petitioner argues that counsel felt beholden to his mother and avoided investigating his family history for

fear of embarrassing or angering her, thus he did not pursue a vigilant defense. No evidence supports this contention.

Counsel was not, in any way, representing Ms. Crowe's conflicting interest. To the contrary, her interests and Petitioner's were the same—to avoid the death penalty. Transcript from Jan. 29, 1999, p. 273. Petitioner does not put forth any evidence that suggests counsel was aware of Ms. Crowe's interest in avoiding a thorough review of Petitioner's family history. In fact, counsel testified that Ms. Crowe supported counsel's attempt to pursue a psychological expert, but Petitioner refused. *See* Transcript from Jan. 28 & 29, 1999, pp. 69, 280. Counsel interviewed Petitioner's mother up to six times, he asked Petitioner to tell him everything he could remember about his life, he hired investigators, and he interviewed friends, co-workers, and other family members. Therefore, even though Petitioner did not tell him about the alleged abuse he suffered as a child, his mother's disturbing behavior, and his drug and alcohol use, no grounds exist to find counsel was operating under a conflict of interest caused by Petitioner's mother's financial support.

Furthermore, even if a conflict existed, Petitioner has not shown that the conflict adversely affected counsel's performance. Counsel spent some 200–250 hours working on Petitioner's case after he entered a guilty plea against counsel's advice. *See* Towson's Order, p. 40. Prior to Petitioner's plea, counsel spent up to 600 hours preparing for the guilt/innocence phase of trial. *Id.* This amount of time and energy is not consistent with a lack of diligence.

As further proof of an alleged conflict of interest, Petitioner claims that, even

---

history is contrary to clearly established Federal law under § 2254(d)(2)," Petitioner's Brief, p. 50; however, Petitioner's conclusion is unreasonable in light of the facts. Judge Towson never stated that counsel did not have

a duty to investigate, rather he found that counsel's investigation was reasonable and not in violation of the duty imposed by *Strickland*. Towson Order, p. 41.

though he did not tell counsel about his unfortunate childhood, counsel should have employed a social worker or mental health expert to basically flush out these facts. According to Petitioner, counsel's failure to do so is evidence of the conflict of interest he was laboring under while defending Petitioner. This contention is also without merit. Counsel, in fact, did hire a psychiatrist to evaluate Petitioner. Dr. Cassandra Newkirk concluded that no psychiatric defenses were available for Petitioner's case, rather that Petitioner was a "cold-blooded murderer." Transcript from Jan. 28, 1999, p. 338.

Also telling in a conflict of interest determination is the fact that, as counsel explained, he had to obtain Petitioner's permission, not his mother's, to consult and pay Dr. Newkirk. *Id.* at 335.

Based on the above, it is clear that counsel's acceptance of fees from Petitioner's mother did not create a conflict of interest which rendered counsel's performance ineffective.

### 6. Fee Disputes

Based on the same facts as above, Petitioner contends that Judge Towson was also wrong to conclude that there was no evidence of a fee dispute between counsel and his assistant, Randy Siegel; counsel and Petitioner's mother; and between counsel and Petitioner and his mother's estate following her death.[11] Petitioner also objects to Judge Towson's reliance on counsel's testimony that the fee dispute did not impact his representation. Petitioner's Brief, p. 50. Petitioner contends that the evidence proves that these monetary disputes harmed counsel's representation of Petitioner, and Judge Towson's decision was an unreasonable determination

of the facts. Petitioner cites absolutely no support for these conclusions.

█ As stated above, a fee dispute does not, per se, create an actual conflict of interest as described in *Cuyler*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *See Devaney*, 47 F.Supp.2d at 133 (citing Model Rule Prof. Conduct 1.8(f)); *Narvaez*, 1998 WL 255429, at *3; *Zhadanov*, 1998 WL 633698; *United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir.1997) ("[W]e presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding [a] fee dispute."). Again, counsel spent some 200–250 hours on Petitioner's case after Petitioner pled guilty. He obtained and interviewed witnesses, spent considerable amounts of time with Petitioner in an attempt to discover more mitigating evidence, and overall, did not exhibit a lack of diligence that can be attributed to a fee dispute. Petitioner's conclusory statements otherwise are without merit.

### 7. Crime Reenactment

Petitioner claims that counsel's failure to object to the reenactment of the crime at Wickes Lumber is cause for a finding of ineffective assistance of counsel. Petitioner's Brief, p. 51. This contention, however, is inconsistent with the record. Counsel objected to a crime scene visit, *see* Transcript from Nov. 14, 1989, p. 1002, he "strenuously" objected to the State's suggestion that Mr. Fite trace the path that the victim took from the cash register to where he fell, *id.* at 1003, and counsel specifically requested, and Judge James agreed, that Mr. Fite would not lay on the ground, *id.* at 1004. Judge James specifically precluded the State from reenacting the crime at the jury's viewing of the scene; "[t]he Court does not want a reen-

---

**11.** Petitioner also objects to Judge Towson's conclusion that Ms. Crowe paying counsel's fee did not create a conflict of interest; however, this Court has already upheld this determination. *See supra*, pp. 1324 – 1326.

actment of the crime ... [or any] theatrics." *Id.* at 1004–05. Therefore, Petitioner's claim that counsel did not object to the alleged reenactment is without factual support.

Overall, applying a reasonableness standard and a measure of deference to counsel's judgment, this Court concludes that the assistance rendered Petitioner by trial counsel, Michael Bergin, was not constitutionally deficient.

### IV. Claims Raised on Direct Appeal and Barred in 2000 State Habeas Petition under *Elrod*

█ In Georgia, if Petitioner's claims were litigated on direct appeal, they are barred from state habeas review because "[a]fter an appellate review the same issues will not be reviewed on habeas corpus." *Elrod v. Ault,* 231 Ga. 750, 204 S.E.2d 176, 176 (1974). Several of Petitioner's claims that the Georgia Supreme Court determined on the merits were subsequently dismissed by the state habeas court based on *Elrod.* As noted in the January Order, these claims are subject to federal review subject to the restrictions of 28 U.S.C. § 2254(d). *Crowe,* 356 F.Supp.2d at 1348. Section 2254(d) requires a federal court to determine whether the state court's decision was "contrary to, or involved an unreasonable application of clearly established Federal Law as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Each claim is discussed in turn.

#### 1. Interference with Right to Counsel

The Sixth Amendment provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Petitioner claims that Judge James and the State, via Sheriff Lee, interfered with his Sixth Amendment right to counsel in two ways. First, by allegedly participating in a scheme to coerce Petitioner to dismiss counsel and plead guilty, and second, by failing to intervene after learning that Sheriff Lee took an allegedly unconstitutional statement from Petitioner. Petitioner's Brief, p. 6.

##### a. Facts

The facts, as established by trial and hearing transcripts as well as orders handed down by Judges James and Emerson of the Douglas County Superior Court and the Georgia Supreme Court, are as follows. This Court defers to the facts unless Petitioner puts forth clear and convincing evidence otherwise. *See* 28 U.S.C. § 2254(e)(1).

█ On March 4, 1988, at Petitioner's initial appearance, Judge James told him that he did not have to give any statements to a law enforcement officer or agency, and if he did, those statements would be used against him. *See* Extraordinary Motion Order, p. 2. Then, on March 31, 1988, Judge James explained that he had received a phone call from Petitioner "express[ing] certain concerns," a letter from the District Attorney indicating conversations between Petitioner and Sheriff Lee concerning Petitioner's representation, and a second call from Petitioner confirming the hearing. *See Crowe,* 458 S.E.2d at 805. Petitioner claims that by accepting the calls and letter and not reporting them to counsel immediately, Judge James interfered with his attorney-client relationship.

The Georgia Supreme Court held that Petitioner initiated these contacts, Judge James reported them to counsel within days, and thus Petitioner was not prejudiced by the communications. *Id.* Petitioner contends this conclusion was unrea-

sonable in light of the facts because the state supreme court did not consider Sheriff Lee's communications with Petitioner. Petitioner's Brief, p. 7. For the reasons set forth below, Petitioner is mistaken.

This Court agrees that, without more, Judge James' accepting Petitioner's phone calls and subsequently reporting them to counsel did not interfere with Petitioner's right to counsel. *See Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("[N]othing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to [defendant's] voluntary, volunteered statements and using them against him at the trial."). Petitioner's interactions with Sheriff Lee, however, are more troubling.

After being indicted, Petitioner was held at the Douglas County jail. While there, Petitioner requested to meet with Sheriff Lee. Sheriff Lee agreed and Petitioner gave him a third, videotaped statement on March 25, 1989. Transcript from Mar. 3, 1994, p. 247.[12] Sheriff Lee did not remember trying to contact Petitioner's counsel before agreeing to meet with Petitioner, *see* Transcript from Mar. 3, 1994, p. 239; however, during their meeting, "[t]he Sheriff pointed out there was a phone sitting before the defendant, and he would allow him to call his lawyer if he wanted to." Extraordinary Motion Order, p. 22. During the meeting, Sheriff Lee asked questions and had Petitioner clarify his statements about the crime. *Id.* at 23.

Sheriff Lee also testified that when he met with Petitioner to obtain this third statement Petitioner asked him, "if I [Sheriff Lee] was in his shoes what would I do." The Sheriff responded, "I said well, David, knowing the evidence that's against you, if I was you they couldn't chain me down in court. I'd get up and say I'm guilty and ask the jury to have mercy on my soul and save my life.... I would have tried to talk my way into saving my life." Transcript from Mar. 3, 1994, pp. 229, 244. Sheriff Lee could not remember if he made that statement before or after Petitioner gave his statement and thus it is unclear whether the Sheriff made that statement before or after he read Petitioner his *Miranda* rights. *Id.* at 254.

During their meeting, Sheriff Lee told Petitioner, "[s]ome of the things that you've alluded to, I've told you is none of my business and I really—it's just because you wanted to tell me; I cannot advise you; is that correct?" Petitioner responded, "Yes; that's correct." Transcript from Nov. 16, 1989, p. 1355 (playing third videotaped statement for jury). Petitioner also claims that Sheriff Lee and Petitioner exchanged letters during April and October of 1989, which demonstrates that the Sheriff was involved in Petitioner's decision to plead guilty.

Sheriff Lee "tr[ied] to respect" lawyers' wishes that their clients not talk to the Sheriff while in custody, *see* Transcript from Mar. 3, 1994, p. 229; however, he did not follow protocol when talking with Petitioner even though he knew that Petitioner was represented by counsel.[13] *Id.* at 245.

---

12. Crowe was present at this 1994 hearing, obviously heard Sheriff Lee's testimony, and did not testify.

13. The videotape of Petitioner's third statement shows Sheriff Lee knew Petitioner was represented by counsel:

**Sheriff**: Okay. And, as a matter of fact, you do have an attorney.
**Petitioner**: Yes, sir.
**Sheriff**: Okay. And furthermore, you've had two (2) attorneys since your arrest?
**Petitioner**: Yes, sir.
**Sheriff**: But only you know whether your attorney knows that you want to give me this statement. I don't know because he hasn't talked to me, but you told me this is your decision.

In fact, Sheriff Lee admitted that, "[k]nowing the responsibility as sheriff, it would be unusual for me to [talk with an inmate in custody without advising him of his right to have his attorney present]." *Id.* at 235. The Sheriff unequivocally stated he did not tell Petitioner anything negative about counsel. *Id.* at 240.

At his hearing on March 31, 1989, Petitioner explained that "Sheriff Lee, I believe, understood my feelings, and I had express [sic] to Sheriff Lee that my attorney did not know that I had requested to make a statement with him. I'm sure that [counsel], thinking of my best interest, would have objected to me doing so; but that was my decision." Transcript from Mar. 31, 1989, p. 6.

When Petitioner entered his guilty plea on May 5, 1989, he stated that he was "not under the influence of any drugs or alcohol or any pressure, coercion, or anything else." Transcript from May 5, 1989, p. 31.

Ultimately, Judge Emerson found "[t]here is no evidence that Lee overtook the will of the defendant ... [or otherwise] deprived the defendant of his right to counsel." Extraordinary Motion Order, pp. 26–28. Rather, "defendant [ ] acted independently and chose to ignore the advice of counsel." *Id.* at 26. "The record is clear that this plea was entered by a well-educated, well-informed, thoroughly counseled adult who labored under no mental handicap." *Id.* at 31.

The Georgia Supreme Court agreed and noted that Petitioner never objected to the use of his third videotaped confession to the Sheriff, and in fact relied on it heavily in mitigation. *Crowe*, 458 S.E.2d at 799.[14] The court was especially persuaded by the fact that Petitioner initiated the contact with Sheriff Lee. *Id.* at 805–06. Petitioner objects to these conclusions.

### b. Application

A defendant's Sixth Amendment right to counsel is critical. The right attaches at or after the initiation of adversarial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (internal citations omitted). Petitioner need not request counsel for the right to exist. *Id.* at 404, 97 S.Ct. 1232. Nor is a Sixth Amendment violation dependent on a formal interrogation. *See Fellers v. United States*, 540 U.S. 519, 524, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004). Once the right attaches, law enforcement officials may not use any "deliberately elicited" and incriminating statements petitioner makes without the presence or waiver of counsel. *Brewer*, 430 U.S. at 399, 97 S.Ct. 1232. To

---

**Petitioner**: This is my decision. He is not aware of it, and I have not talked with him about it.
**Sheriff**: Do you know, before you is a telephone; if you want to call him, I will allow you to use that telephone.
**Petitioner**: Yes.
**Sheriff**: Okay. But you still want to proceed and tell me what you are accused of?
**Petitioner**: Yes; this is my decision.
Transcript from Nov. 16, 1989, p. 1356.

14. The Court also found that Judge Emerson was correct in not considering the "new" evidence Petitioner submitted eleven months after his sentencing. The evidence was Petitioner's affidavit, which stated that the facts underlying his interference with counsel claim were not available until eleven months after the sentencing trial because Petitioner withheld them from counsel. Judge Emerson held that the affidavit was self serving, not truthful, and that no factual basis supported the assertions in Petitioner's motion. The Supreme Court upheld this factual determination. *Crowe*, 458 S.E.2d at 809. Petitioner has not put forth clear and convincing evidence to show that this factual conclusion was unreasonable and thus this Court agrees with the state courts that Petitioner's affidavit does not entitle him to relief. 28 U.S.C. § 2254(e)(1).

prove that petitioner has waived his right to counsel, the state must show that the petitioner did so knowingly and intelligently. *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Edwards,* 451 U.S. at 482, 101 S.Ct. 1880.

Petitioner claims that Sheriff Lee's actions were in violation of the Supreme Court's principles established in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424; and *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). This Court disagrees.

According to the Supreme Court, " 'from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation (are) vitally important, the defendants . . . (are) as much entitled to such aid (of counsel) during that period as at the trial itself.' " *Massiah,* 377 U.S. at 205, 84 S.Ct. 1199 (citing *Powell v. Alabama,* 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). In *Massiah,* petitioner was free on bail and made incriminating statements to a fellow co-defendant, turned government informant. A federal agent installed a radio transmitter in the informant's car and then sat in a nearby car with a receiving device to hear petitioner's incriminating statements. The federal agent then testified as to petitioner's statements. The Court held that "petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. 1199.

The Court applied the "deliberately elicited" test in a subsequent case, *Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry,* the Court faced another Sixth Amendment claim involving incrimi-

nating statements made by the petitioner to an undisclosed and undercover government informant who was also petitioner's cell-mate. The Court found particularly persuasive three factors: the agent was acting under instructions as a paid government informant, the agent was no more than a fellow inmate of petitioner, and petitioner was in custody and under indictment at the time he was engaged in conversation by the informant. *Id.* at 270, 100 S.Ct. 2183. The Court held that even if the government did not intend for the informant to take affirmative steps to secure incriminating information, "he must have known that such propinquity likely would lead to that result," especially given the fact that the informant's fee was contingent on furnishing information. The Court also recognized the "powerful psychological inducements to reach for aid when a person is in confinement." *Id.* at 274, 100 S.Ct. 2183. Ultimately, the Court held, "[b]y intentionally creating a situation likely to induce [petitioner] to make incriminating statements without the assistance of counsel, the Government violated [petitioner's] Sixth Amendment right to counsel." *Id.*

Finally, in *Brewer,* petitioner abducted a girl in Des Moines, Iowa, and was later arrested in Davenport, Iowa. He retained counsel in both locations and both attorneys told petitioner not to speak with officials until he consulted with his counsel in Des Moines. Officials transporting petitioner between cities agreed not to question him. En route from Davenport to Des Moines, police officers appealed to petitioner's well-known, devout religious beliefs and asked him to locate the body so that the victim's family could give her a "Christian burial." *Brewer,* 430 U.S. at 393, 97 S.Ct. 1232. Petitioner eventually directed the police to the victim's body and he was indicted for murder. The Court held that the officers "deliberately and de-

signedly set out to elicit information from [petitioner] ... [because they] purposely sought during [petitioner's] isolation from his lawyers to obtain as much incriminating information as possible." *Id.* at 399, 97 S.Ct. 1232. The Court found it irrelevant that the incriminating statements in *Massiah* were "elicited surreptitiously" but were not in *Brewer. Id.* at 400, 97 S.Ct. 1232. Finally, the Court found petitioner did not waive his right to counsel; "[i]t is true that [petitioner] had been informed of his right to counsel. But waiver requires not merely comprehension but relinquishment, and [petitioner's] consistent reliance upon the advice of counsel [15] in dealing with the authorities refutes any suggestion that he waived that right." *Id.* at 404, 97 S.Ct. 1232.

■ Applied to the instant action, there can be no doubt that judicial proceedings had been initiated against Petitioner—he was in custody—so the question is not whether Petitioner had the right to counsel. The issues are (1) whether Sheriff Lee "deliberately and designedly set out to elicit information" from Petitioner, *see Brewer,* 430 U.S. at 399, 97 S.Ct. 1232; or deliberately used his position to secure incriminating information from Petitioner when counsel was not present, *see Henry,* 447 U.S. at 270, 100 S.Ct. 2183; and (2)

whether Petitioner validly waived his right to counsel by contacting Sheriff Lee.

Petitioner claims that his relationship with Sheriff Lee was one of trust and confidence and that the Sheriff manipulated him in order to induce Petitioner to fire counsel and plead guilty. Petitioner's Reply to Respondent's Brief on the Issues, p. 10. However, Petitioner has not shown that Sheriff Lee "deliberately elicited" his third statement. Sheriff Lee simply being available and responding to Petitioner's question is wholly separate from arranging for a paid informant to obtain incriminating information, planting covert devices in order to hear petitioner's conversation with an undercover informant, or otherwise taking affirmative steps to ensure access to incriminating information. Even assuming as true Petitioner's contention that Sheriff Lee's treatment of Petitioner established a relationship of trust and confidence—a relationship that this Court is particularly skeptical of—it does not satisfy the Supreme Court's test for unconstitutional interference with the right to counsel.[16]

■ Furthermore, Petitioner's initiation of contact with Sheriff Lee on March 25, 1989 was a voluntarily waiver of his right to counsel.[17]

15. Petitioner had secured counsel in Des Moines and Davenport and had told the officers that he would tell them the whole story after he spoke with his attorney in Des Moines. Petitioner only revealed the source of the body after repeated statements by the police. *Brewer,* 430 U.S. at 404–05, 97 S.Ct. 1232.

16. Even assuming, for the sake of argument, that Sheriff Lee's actions did violate Petitioner's Sixth Amendment right to counsel, Petitioner was not prejudiced. *United States v. Bell,* 776 F.2d 965, 972–73 (11th Cir.1985). Petitioner was thoroughly advised by counsel before and after his third statement. He even

admitted that his counsel would not agree with him giving the statement. Prior to pleading guilty, Judge James thoroughly questioned Petitioner's capacity to do so and gave him multiple opportunities to consult with counsel. Therefore, Petitioner was fully aware of his right to counsel and had every opportunity to rely on and assert that right.

17. Although the Georgia Supreme Court did not expressly hold that Petitioner waived his right to counsel, its reliance on the fact that Petitioner initiated contact with Sheriff Lee had the same effect. *See Crowe,* 458 S.E.2d at 805.

Waiver is a matter of federal law and the state must prove "an intentional relinquishment or abandonment of a known right or privilege." *Brewer*, 430 U.S. at 404, 97 S.Ct. 1232 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The Supreme Court has explained that if a defendant initiates contact with authorities, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880. *See also Estelle v. Smith*, 451 U.S. 454, 471, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (" 'Volunteered statements ... are not barred by the Fifth Amendment.' ") (citing *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). In *Jackson*, 475 U.S. at 628, 106 S.Ct. 1404, the Court extended this principle to the Sixth Amendment by affirming the Michigan Supreme Court's holding that once a defendant requests counsel, "the police may not conduct further interrogations until counsel has been made available to the accused, unless the accused initiates further communications, exchanges, or conversations with the police." *See also Henry*, 447 U.S. at 273, 100 S.Ct. 2183 ("An accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then 'arms length' adversaries.").

Waiver may also be inferred by Petitioner's actions that were often contrary to counsel's advice. While "consistent reliance upon the advice of counsel in dealing with the authorities" may refute any suggestion of waiver, *see Brewer*, 430 U.S. at 404, 97 S.Ct. 1232, the counter is true as well. *Self v. Collins*, 973 F.2d 1198, 1218–19 (5th Cir.1992). For example, Petitioner insisted counsel not hire more expert witnesses, he met with Sheriff Lee even though he knew counsel would discourage it, and, most drastically, he entered a guilty plea while counsel adamantly opposed his decision. There was never any allegation that Petitioner lost confidence in counsel, rather he just disregarded his advice. *Id.*

Therefore, the evidence shows that neither Sheriff Lee nor Judge James violated Petitioner's Sixth Amendment right to counsel. They did not "deliberately elicit" incriminating statements from him, and Petitioner waived his right to counsel by initiating contact with them and acting contrary to counsel's advice. Petitioner's claim to the contrary is denied.

### 2. Use of a "Cleansed" Indictment

Petitioner claims that the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by presenting the jury with a false indictment. Petitioner's Reply to Respondent's Brief, p. 12. Petitioner claims the trial court prevented him from offering proof of remorse and allowed the prosecution to "falsify a document contradicting [Petitioner's] remorse." *Id.* at 13. The Georgia Supreme Court's rejection of this claim, says Petitioner, is factually unreasonable and contrary to and an unreasonable application of, clearly established Federal law under § 2254(d). *Id.*

Petitioner adamantly contends that he entered his guilty plea pro se. This determination is a factual matter, one that the state courts relied on, and one this Court will defer to unless Petitioner puts forth clear and convincing evidence otherwise. 28 U.S.C. § 2254(e). Below is the transcript from the events leading up to Petitioner's plea on May 5, 1989 before Judge James:

**Petitioner:** Your honor, if I might, may I indulge the Court at this time to allow

me to waive my Constitutional right to counsel -

**Counsel:** (Interposing) Your Honor, before we go any further, can I have a conference with my client, please?

**Court:** I would like for you—I'll entertain that at the proper time. I would like for you to discuss it with counsel so that, with the latest events, you'll be apprised of what's going on and what the implications are. For me to allow you to waive counsel and represent yourself, I must be assured that you pretty well know what's going on. And I want the attorneys to discuss that with you so that, as to any last-minute details, you have information that you could act upon.

\* \* \* \* \* \*

**Counsel:** Your Honor, I did clarify with [Petitioner] our conversation last night and his decision this morning, which has been gone over several times over the weeks, the intervening weeks.

At this point, [Petitioner] would like to make his own announcement. Your Honor, I believe he intends to plead guilty.

**Court:** [Petitioner]?

**Petitioner:** Your Honor, if I may, for the purposes of the record and the Court, I would like at this time ask if I may waive my right, my Constitutional right to counsel and proceed pro se? But also for the purposes of the record and the Court, I would like to say that I am—up to this point have been satisfied with the work that both [counsel] have done regarding my case. I feel at the utmost level of capability and competence, given what I have given them to work with. And I have no dissatisfaction with them, but at this time I would like the Court, if it would, to entertain a motion that I waive my Constitutional right to counsel and proceed pro se.

**Prosecutor:** ... I don't know if that's a complete waiver of his right to an attorney; it's just he disagrees with them.

**Court:** [Petitioner], I perceive that there is something you want to do which your counsel has advised you not to do.

**Petitioner:** That's correct, sir.

**Court:** Have you directed your counsel to assist you in doing what you want to do?

**Petitioner:** I've directed my counsel that I would like to proceed on my own.

**Court:** Is there any way your counsel could assist you, though, and still remain as your legal advisor and representative to accomplish what you want to accomplish?

**Petitioner:** Well, if to preserve the Court and the Court record, if the Court feels that I should have my attorney stand with me, then I, of course, would want my attorney of record to stand with me if the Court feels that is necessary to protect the record and to protect the Court.

**Court:** Well, the Court is not interested—the Court appreciates your concern for the record and protection for the Court. What the Court's concern is the protection of all the rights you have as a citizen of this country and this state.

If you have developed a difference of opinion as to how to proceed with your lawyer, a lawyer can still help you accomplish your objective. The lawyer may have to tell the Court they're not in accord with what you're doing but it's your wishes. You still have then your relationship of counsel and, if you need to ask questions of counsel or have someone advise you who is on your side of the case who is looking out after your interest, should something develop during the proceeding that you need that advice, you'll have someone to turn to.

So, you can still have counsel. You do not have to waive counsel just because you and counsel have a difference of opinion on the way to proceed.... [Court offers Petitioner and counsel another opportunity to meet, but Petitioner declines].

**Petitioner:** Well, Your Honor, I am—I am aware of the things that could and could possibly happen regarding what I intend to do. Taking all things into consideration, I feel that I am aware of the consequences on both sides of the issue. And if the Court would indulge me, I would please ask that I could go on ahead and proceed by myself.

**Court:** Well, that gets more in the nature of waiving counsel, but your counsel are here today. Would you like them to assist you in whatever you wanted to do today? They're here.

**Petitioner:** I would prefer to do it myself, Your Honor. At the initial onset of this hearing, you told me that I had the—that I have the right to exclusion and may I ask if I still retain that right since this is a continuation of the initial hearing? And what I would like, if the Court would indulge me, if it's possible, I would ask that all persons be excluded from this hearing except Your Honor and the court stenographer, myself, [state prosecutor,] [Sheriff Lee] and, of course, my wife and her sister, if that would be acceptable to the Court.

**Court:** If you intend or should you intend to tender to the Court a plea different from what you have done, I cannot exclude the public then. That is, in the essence, the public trial.... Now, I'm going to again take a few moments and allow you to talk with counsel about what function you'd like for them to serve in the next step, whatever you want to do, and tell them what to do. They're here; at least they can go over with you the procedural matters that will be taken up, the questions that would be asked of you. And if you have any questions to ask them, they can tell you. But you have a right to direct the course of your conduct of your trial. And whether it's over their objection or not, that's your right....

[Court holds another recess].

**Counsel:** Your Honor, if I might, [Petitioner] has advised me of four (4) things that he would like to do immediately with this Court. As I believe my—mine and [co-counsel's] last official act, he would like us to withdraw our motion upon which the Court granted the interlocutory appeal.

Subsequent to that, he would like to tender a Plea of Guilty on a pro se basis to Count One of the indictment....

I have expressed to him naturally—our disagreement has been going on since his last statement. He is fully aware of that. We have gone over the procedural aspects of how a person pleads guilty, what rights they should be informed of by the Court and that they have to knowingly and intelligently and voluntarily waive each and every one of those rights and the Court has to be satisfied that he understands all of those.

Thank you, Your Honor.

**Court:** [Petitioner], you've heard your counsel's statement. Is that what he—you directed him to do?

**Petitioner:** Yes, sir.

**Court:** All right. Well, as to—I'll allow the withdrawal of the motion, but as to punishment phase, [Petitioner], the Court believes that that is an item that the public should impose on anyone; that the Court should not impose punishment. If the State asked for the death penalty, then it should be proved to a body of twelve (12) people who serve on a jury.

And the Court has no problem receiving your Plea of Guilty and, in effect, having only a trial as to punishment....

If you do not have money with which to hire an attorney for that phase, should you desire one, the County—I will appoint an attorney to represent you during that phase at no cost to you, if that's your desire.

**Petitioner:** If we're going to proceed that way, I would like for [counsel] to continue -

**Court:** (Interposing) Okay.

**Petitioner:**—for the mitigation phase.

**Court:**—in the mitigation phase, the punishment phase, as we call it.

**Petitioner:** Yes, sir.

**Court:** All right. If you're prepared in accordance with what your attorney has said, if you and your attorney and the State would come forward, the Court will proceed to determine whether or not it will accept your Plea of Guilty. [Petitioner], the Court has before it a special presentment that the Grand Jury of Douglas County returned March the 8th, 1988. In that presentment, the Grand Jury charged you with the offenses of murder and armed robbery.

In accordance with your indication now in open court that you desire to tender a guilty plea as to both counts, as to Count Two subject to what we call the *Alford* case, there are certain things I want to make sure you know before we proceed. And I'm going to go over them with you and I'll ask that you respond to me so that I know that you understand them.

[Court proceeds to question Petitioner about his age, education, awareness of the proceedings, understanding about right to jury, representation, right to be present, cross-examine any witnesses, subpoena witnesses, right to remain silent, testify, present evidence, and have a jury trial].

**Petitioner:** Yes, sir.

**Court:** All right. You may proceed, [Prosecutor].

**Prosecutor:** [Explanation of counts against Petitioner]. Do you understand that as to Count One you could be given a sentence of up to life in prison or a death sentence?

**Petitioner:** Yes, sir.

**Prosecutor:** And do you understand what the Judge has described to you, that there would be—he's not going to allow you to waive your right to a jury trial on the issue of life or death on this guilty plea you're about to enter?

**Petitioner:** Yes, sir.

\* \* \* \* \* \*

[Explanation of Count Two and related sentencing].

\* \* \* \* \* \*

**Prosecutor:** Okay. Tell the Court then what you wish to do as to Count Number One, plead guilty or not guilty.

**Petitioner:** Your Honor, I'd like to withdraw my Plea of Not Guilty to Count One of the indictment and plead guilty.

\* \* \* \* \* \*

**Prosecutor:** Do you have any questions at all?

**Petitioner:** No, sir.

**Prosecutor:** If you would sign right here (indicating). Is this going to be without y'all's signature?

**Counsel:** According to [Petitioner], yes. And then we will come back in for the trial if the Judge says so in mitigation.

**Prosecutor:** Okay. And I'm going to write on here, Your Honor, also that he waives an attorney at this point. If you'll just initial right beside it.

Transcript from Proceedings, May 5, 1989, pp. 10–29.

Before Judge James gave the jury instructions, counsel demanded that the jury see the original indictment bearing Petitioner's signature, which indicated that he pled guilty pro se, but Judge James refused. Instead, he granted the Prosecution's request that the jury see a "cleansed" indictment which did not note that Petitioner's guilty plea was given pro se. Transcript from Nov. 18, 1989, pp. 1822–31. As stated above, Petitioner claims the trial court's decision prevented him from offering proof of remorse and allowed the prosecution to present false evidence. Petitioner's Reply to Respondent's Brief, p. 13.

The Georgia Supreme Court rejected Petitioner's claim and held:

> The record reflects that, although [Petitioner] may have entered his guilty pleas against the advice of counsel, he did not waive the right to counsel and he was represented by counsel at all times both before and after pleading guilty. [Petitioner] conferred with counsel several times during the plea hearing itself. Furthermore, after stating that he wished to plead guilty but before entering his pleas, [Petitioner] told the trial court that he wanted his attorney to represent him in the sentencing trial.

*Crowe,* 458 S.E.2d at 805–06.

As explained above, the AEDPA states, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This Court finds that Petitioner has not put forth sufficient evidence to rebut the state court's factual conclusion that Petitioner did not plead guilty pro se. The trial transcript shows that the parties used the phrase "pro se;" however, the overriding question is whether Petitioner had the advice and benefit of counsel throughout the proceeding. Simply because Petitioner acted against the wishes of counsel does not show that he was denied the benefit of the same. Therefore, this Court defers to the state court's conclusion that Petitioner did not, in fact, proceed pro se and thus its use of a "cleansed" indictment was not improper admission of false evidence.

Even assuming, without deciding, that use of the cleansed indictment was improper, Petitioner is not entitled to relief because the mistake was not prejudicial. The transcript leading up to Petitioner's plea entry was submitted as evidence, *see* Transcript from Nov. 18, 1989, p. 1831; counsel explained numerous times that Petitioner pled guilty, *see* Transcript from Nov. 14, pp. 811, 814, 817–21; Nov. 18, 1989, pp. 1835, 1841–42, 1847; counsel even told the jury that Petitioner entered his guilty plea pro se and against the advice of counsel, Transcript from Nov. 14, pp. 812–13; and Judge James's jury charge referred to Petitioner's guilty plea, Transcript from Nov. 18, 1989, p. 1864.

The jury heard on numerous occasions that Petitioner accepted responsibility for his actions. This Court does not agree that despite all of the references to his guilty plea, if the jury had seen the actual indictment that said Petitioner pled guilty pro se, at least one juror would not have voted for the death penalty. Petitioner's Reply to Respondent's Brief, p. 17. Therefore, even though the jury did not see the actual indictment, the trial court did not violate Petitioner's rights by sending the jury out with the "cleansed" indictment.

### 3. Unconstitutional Limits on Mitigation Evidence

Similar to the above argument, Petitioner claims the trial court improperly limited his presentation of mitigating evidence. The bases for this objection are the trial

court's failure to send out the original indictment with the jury and its refusal to admit Petitioner's complete third videotaped statement to Sheriff Lee. *Id.* at 18.

Petitioner's contention with respect to the videotaped statement is contrary to the record and thus it is without merit. *See* Transcript from Nov. 16, 1989, pp. 1353–1401 (playing entire statement).

▓▓▓▓▓▓ With respect to his mitigation claim, Petitioner is correct that courts are not to limit mitigating evidence in death penalty cases. "In order to ensure 'reliability in the determination that death is the punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (internal citations omitted). Respondent contends, however, that the indictment is not evidence and thus the jury's not seeing the original indictment is not error.

The seminal Supreme Court case regarding mitigating evidence is *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). There, the Court held, "we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. 2954 (emphasis in original). However, courts may still "exclude, as irrelevant, evidence not bearing ·on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605 n. 12, 98 S.Ct. 2954.

*Lockett* is distinguishable from Crowe's case because *Lockett* involved an Ohio statute which required imposition of the death penalty following a finding of aggravated murder and at least one aggravating circumstance unless the victim induced the murder or unless the offender was under duress, coercion, strong provocation, or his actions were the result of psychosis or mental deficiency. 438 U.S. at 607, 98 S.Ct. 2954. Here, no statute required the jury to impose the death penalty or expressly precluded the jury from considering all mitigating factors and evidence. The trial judge simply withheld the indictment noting Petitioner's pro se guilty plea, which is not evidence in Georgia. *Bostick v. Ricketts,* 236 Ga. 304, 223 S.E.2d 686, 687 (1976). The jury was aware of the fact that Petitioner pled guilty and thus the absence of the actual document during deliberation was not an unconstitutional limitation of Petitioner's Constitutional right to present mitigating evidence.

### 4. Prosecutorial Misconduct

According to Petitioner, this Court should set aside his death sentence because of the prosecutor's misconduct at his sentencing hearing. The bases for Petitioner's claim are the prosecutor's representation that Petitioner was represented by counsel when he pled guilty; prosecutor's religious reference in closing arguments; and presentation of the "cleansed" indictment to the jury. Petitioner claims that the Georgia Supreme Court's decision otherwise is without merit and not entitled to deference under 28 U.S.C. § 2254.

#### a. Represented by Counsel

First, Petitioner claims the prosecutor improperly argued in closing arguments that Petitioner pled guilty with the advice of counsel and presented a "cleansed indictment" to show as much. Petitioner's Brief, p. 16.

During closing arguments, the Prosecutor said, "When we were listening to open-

ing statements, [Petitioner's counsel] told you that [Petitioner] didn't want to play lawyer games. He wanted to fire his lawyer. You know, ladies and gentlemen, lawyer games are when an attorney brings up things that are not in evidence. Tell me one person that has taken this stand and said that that man fired his lawyer? ... We have no idea whether that lawyer's been fired or not. There haven't been any documents or anything introduced to prove that." Transcript from Nov. 18, 1989, pp. 1798–1800. Petitioner claims these comments are along the lines of those found unconstitutional in *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Petitioner is mistaken.

■ A conviction obtained through use of false evidence, known to be such by state representatives, or failure to correct the same, violates the Fourteenth Amendment. *Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (internal citations omitted). The state violated this amendment in *Miller* by making repeated references to the defendant's "bloody shorts" that were allegedly stained with blood matching the victim's blood type. The shorts played a vital part in the prosecution's case, yet they were not actually defendant's shorts and the prosecutor knew at the time of trial that it was not blood on the shorts, rather paint. The Court held that the prosecutor deliberately misrepresented the facts. *Miller*, 386 U.S. at 5–7, 87 S.Ct. 785.

In *Napue* the state violated the petitioner's Fourteenth Amendment rights by not correcting a key witness's knowingly false testimony. The witness stated that he had not received a promise of consideration in return for his testimony, yet the prosecutor knew otherwise. The Court held that the prosecutor's failure to correct the testimony, which he knew was false, denied

petitioner due process. *Napue*, 360 U.S. at 265, 79 S.Ct. 1173.

Here, the prosecutor's statements were accurate. No witness testified that Petitioner pled guilty pro se and the indictment noting Petitioner's pro se guilty plea was not admitted into evidence. Therefore, the prosecutor's statements were not knowing misrepresentations of fact or did not otherwise deprive Petitioner of due process.

■ This Court is also not persuaded that the prosecutor's presentation of a cleansed indictment was unconstitutional. An improper prosecutorial argument renders a "capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, ... which is to say that absent the argument the defendant would not have received a death sentence." *Romine*, 253 F.3d at 1366 (citing *Brooks*, 762 F.2d at 1401). As concluded above, presentation of a cleansed indictment did not prejudice Petitioner in light of the fact that he, in fact, did not plead guilty pro se and counsel made several references to the fact that he accepted responsibility for the crime by pleading guilty.

Therefore, the prosecutor's statement, his argument at the close of evidence that Petitioner was represented by counsel at all times, and his acquiescence in the trial court's decision to send out a cleansed indictment were not instances of unconstitutional prosecutorial misconduct.

b. Petitioner's Fifth Amendment Right

Petitioner also claims the Prosecutor's closing arguments infringed upon his Fifth Amendment right to remain silent. During closing arguments, the prosecutor accused Petitioner of being a "liar" and not having "the guts to come in here and tell you the truth." Transcript from Nov. 18, 1989, p. 1792; *Crowe*, 458 S.E.2d at 811.

Petitioner's counsel objected. Judge James overruled the objection, said the prosecutor's comments referred to the statements already introduced, and explained to the jury that Petitioner "does not have to testify in the case." Transcript from Nov. 16, 1989, p. 1792. The prosecutor followed up; "[s]ure, he doesn't have to testify, just like he said, and we're talking about what he did do." *Id.*

The state habeas court found that the prosecutor's statements were not a violation, rather they were a permissible attack on the credibility of Petitioner's conflicting statements, particularly his third videotaped statement, and thus the comment was consistent with the holdings in *Ledford v. State*, 264 Ga. 60, 439 S.E.2d 917 (1994), and *Hill v. State*, 263 Ga. 37, 427 S.E.2d 770, 776–77 (1993) (finding the prosecutor's statement, "nobody knows the motive but [defendant], and he's not talking," was improper, but curable by trial court's instruction that the jury was to disregard the statement and note that a defendant does not have to prove his own innocence).

The Supreme Court has stated that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (prosecutor questioned each defendant on cross-examination about why he waited to assert a frame-up story at trial rather than when they were arrested).[18]

■■■■ The Eleventh Circuit's test for whether a prosecutor's comments infringe the Fifth Amendment right to silence asks "whether or not 'it can be said that the prosecutor's manifest intention was to comment upon the accused's failure to testify [or] was ... of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Ward*, 552 F.2d 1080, 1083 (5th Cir.1977) (quoting *Samuels v. United States*, 398 F.2d 964, 968 (5th Cir.1968)).[19] *See also United States v. Guerra*, 293 F.3d 1279, 1289 (11th Cir.2002); *Bertolotti v. Dugger*, 883 F.2d 1503, 1524 (11th Cir.1989). The reviewing court is to consider the overall trial context of the comment, *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987), and a conclusion about the propriety of a prosecutor's comments must consider the entire proceedings in the case. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Any finding that the prosecutor, in fact, violated a petitioner's right is subject to harmless error review. *Doyle*, 426 U.S. at 620, 96 S.Ct. 2240.

■■■■ Applied to Petitioner's case, the Georgia Supreme Court found that the prosecutor's statements were a "permissible attack on the credibility of [Petitioner's] conflicting statements and particular-

---

**18.** Petitioner also relies on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in support of his position. Such reliance is misplaced. *Estelle* involved the state's use of statements defendant made to a psychiatrist during a competency examination. Defendant and counsel were unaware that the State intended to use the information and/or call the psychiatrist as a witness at trial. The Court held that "the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to

Dr. Grigson similarly infringes Fifth Amendment values." *Id.* at 463, 101 S.Ct. 1866.

Here, the State did not use comparable statements against Petitioner at his sentencing hearing and thus *Estelle* is not persuasive support for Petitioner's claim.

**19.** This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

ly his third, videotaped statement." *Crowe*, 458 S.E.2d at 811. This explains the prosecutor's intentions. However, "[h]e doesn't have the guts to come in here and tell you the truth," is of "such a character that the jury would naturally and necessarily" see this as a comment on the Petitioner's failure to testify. *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir.1977).

While the state supreme court is correct that the prosecutor was allowed to infer Petitioner was a liar, he may not use Petitioner's decision not to testify against him. The prosecutor's statement, interpreted naturally, faults the Petitioner (not just the defense)[20] for not taking the stand in his hearing to explain the inconsistencies in his statements. However, considering the entire proceedings and the trial court's curative instruction, any error by the State was harmless. *Guerra*, 293 F.3d at 1289. Therefore, Petitioner's assertion that the prosecutor violated his Fifth Amendment right to silence is denied and is not grounds for a finding of prosecutorial misconduct.

### c. Right to Jury

The prosecutor also described Petitioner as "someone who believes in the death penalty, who believes in execution of human beings without a jury trial, without *Miranda* warnings, without a tape recorder, without looking them in the eye." Transcript from Nov. 16, 1989, pp. 1821–22. Petitioner claims this statement was an improper comment on his right to due process and a jury trial. Petitioner's Brief, p. 24.

Petitioner relies on *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir.1991). In *Cunningham*, the prosecutor stated that he was "offended" defendant had exercised his Sixth Amendment right to trial by jury in the guilt-innocence phase and then questioned whether the defendant was even entitled to Sixth Amendment rights. *Id.* at 1019. The Eleventh Circuit characterized these statements as "outrageous" and a clear violation of the defendant's Sixth Amendment right. *Id.* at 1020. The prosecutor in the instant action did not make any similarly egregious comments and thus Petitioner's reliance on *Cunningham* is questionable.

More analogous to the instant action is *Donnelly*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431. There, the prosecutor stated, "[t]hey said that they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." *Id.* at 640, 94 S.Ct. 1868. The Court admitted that the statement was ambiguous, but found that the comment

> "was but one moment in an extended trial and was followed by specific disapproving instructions.... Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions [as the statements in *Miller v. Pate* ] .... [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

*Id.* at 645–47, 94 S.Ct. 1868. "It 'is not enough that a prosecutor's comments are undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal citations omitted).

Here, the Prosecutor's description of Petitioner as "someone who believes in the

---

**20.** The Eleventh Circuit has held that a prosecutor's reference to the "defense's" failure to counter or explain the testimony or evidence presented is not a violation of a defendant's Fifth Amendment privilege. *United States v. Norton*, 867 F.2d 1354, 1364 (11th Cir.1989).

death penalty, who believes in execution of human beings without a jury trial, without Miranda warnings, without a tape recorder, without looking them in the eye," *see* Transcript from Nov. 16, 1989, pp. 1821–22, does not rise to the level of infecting "the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 168, 106 S.Ct. 2464. The statements were arguably a comment on Petitioner's three previous confessions and, in the context of the entire trial, did not make the proceedings "fundamentally unfair" or otherwise deny Petitioner due process. *See Romine*, 253 F.3d at 1366 (internal citations omitted).

### d. Religious References

Petitioner also contends that the prosecutor's religious references during closing arguments are grounds for vacating his sentence. However, as discussed above, the prosecutor's statements did not render Petitioner's sentencing hearing "unfair," *id.*, and thus are not grounds for prosecutorial misconduct that would require dismissal of Petitioner's sentence. *See* supra, pp. 1323 – 1324.

### 5. Suppression of Evidence

Petitioner's suppression of evidence claim is based on the State's alleged failure to provide copies of sheriff's deputies' reports, even though trial counsel saw the same reports when reviewing the State's files pursuant to its open file policy. Petitioner's Amended Petition for Habeas Corpus, pp. 34–35. Petitioner claims he could not locate the same files prior to the motion to suppress hearing and that the State used substantially different reports at the

hearing. *Id.* Petitioner also claims that the State improperly suppressed exculpatory evidence.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court explained, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Several years later, in *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court held that the petitioner must establish three elements to prove a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82, 119 S.Ct. 1936. Petitioner's allegation that the State improperly suppressed evidence does not meet the test for the following reasons.

### a. Sheriff's Deputies' Reports

■ As Petitioner admits, his counsel had access to the files and actually reviewed the disputed reports. The State's failure to make and provide copies of these reports is not a violation of *Brady*. *Brady* only prohibits *"suppression"* of evidence. 373 U.S. at 87, 83 S.Ct. 1194 (emphasis added). Counsel had access to the disputed files and thus there was no *Brady* violation with respect to these reports.

The State's alleged suppression of exculpatory evidence is more troubling.[21]

---

21. The alleged exculpatory evidence includes a chart of the crime scene, documents created by the State's experts and employees of the Georgia Crime Lab, a photograph of an officer that allegedly shows the State tampered with the crime scene, a transcript of Sheriff Lee's interview with Petitioner's wife, a chro-

nology of the events leading up to the search of Petitioner's home which was prepared by a Sheriff's Department employee, other reports and notes prepared by Sheriff's Department employees, fingerprints of Wickes Lumber

Judge Towson found that Petitioner had shown cause for his late assertion of these claims because the State did not produce the records until Petitioner's Open Records Act request even though it should have produced them earlier. *See* Towson Order, pp. 26–27. Counsel did not have access to this evidence prior to trial. Transcript from Jan. 28, 1999, pp. 93–96, 104–05, 106–07, and 116–19. However, Judge Towson found Petitioner did not show that the cumulative effect of the evidence had an effect on the verdict given Petitioner's guilty plea. This Court agrees that the requisite prejudice is absent.

Petitioner claims that all of the exculpatory evidence, taken as a whole, renders a *"verdict* that is not worthy of confidence because there is a reasonable probability that the outcome of the proceeding would have been different if all of this evidence had been disclosed." Petitioner's Amended Habeas Petition, pp. 38–39 (emphasis added). Petitioner is mistaken. Regardless of the exculpatory evidence, the verdict would have been the same because Petitioner pled guilty.[22]

b. Failure to Seal the State's File or Conduct *in camera* Inspection of File

Petitioner also claims Sheriff Lee kept the Sheriff's Department's file in his home until February 1997, when Petitioner requested access pursuant to the Open Records Act, and thus, Sheriff Lee could have tampered with the evidence. Petitioner's Amended Habeas Petition, p. 39. This allegedly shows that the trial court improperly refused to seal the State's file or conduct an *in camera* review in order to prevent such tampering. *Id.* at 38–40. The Georgia Supreme Court rejected this position because Petitioner had open access to

the file. *Crowe,* 458 S.E.2d at 807. While the state court's decision did not address the evidence discovered pursuant to the Open Records Act request, this Court agrees that no *Brady* violation occurred such that Petitioner's sentence is improper.

██ Petitioner does not cite any support, and this Court knows of none, that supports his contention that the trial court had a duty to seal and/or conduct an *in camera* review of his file. An *in camera* review was unnecessary given the State's open file policy and the court had no cause for sealing the record at that time. Petitioner claims that the State's refusal to seal the file and the disappearance of certain files prevented material exculpatory evidence from being available at all times; however, as stated above, counsel reviewed the files that allegedly disappeared and the other exculpatory evidence was not material to the verdict because Petitioner pled guilty.

Petitioner's reliance on *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), is inappropriate. In *Kyles,* defendant's counsel filed a motion requesting any exculpatory or impeachment evidence. The State responded that there was " 'no exculpatory evidence of any nature,' despite the government's knowledge of" seven (7) key pieces of exculpatory evidence, such as conflicting eyewitness statements, conversations between officers and witnesses, license plate numbers of other cars at the scene of the crime on the same night, and evidence linking the main witness to crimes at the location of the crime. *Id.* at 428–29, 115 S.Ct. 1555. The first trial resulted in a hung jury, but defendant

---

employees, Petitioner's bank account records, and notes from Petitioner to Sheriff Lee.

**22.** Assuming Petitioner meant to contend that his *sentence* would have been different, *see*

*Brady,* 373 U.S. at 87, 83 S.Ct. 1194, this Court still disagrees that the suppressed evidence was prejudicial. *See* infra, pp. 1345 – 1346.

was later convicted and sentenced to death. *Id.* at 422, 115 S.Ct. 1555.

The instant action is distinguishable given the amount and nature of the suppressed evidence in *Kyles,* as well as the fact that Petitioner pled guilty. Therefore, the State's actions do not "undermine[ ] confidence in the outcome of the trial," *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and Petitioner is not entitled to relief.

### 6. Acceptance of Petitioner's Guilty and *Alford* Pleas

Petitioner claims that the state supreme court incorrectly concluded that he did not proceed pro se and thus the court failed to conduct a searching inquiry to determine if he was aware of the consequences of proceeding pro se as required by *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Petitioner's Brief, pp. 30–31. As discussed above, this Court adopts the state court's conclusion that Petitioner did not proceed pro se and thus Petitioner's claim that the trial court improperly accepted his guilty and *Alford* pleas is without merit.

### 7. Admission of Pretrial Suppression Hearing Statement

Petitioner claims the trial court should not have admitted statements he made at his pretrial suppression hearing during the sentencing hearing. The Georgia Supreme Court rejected this claim and held:

> [Petitioner's] suppression hearing testimony became relevant to the question of his sentence when his counsel asked the sheriff if he did not believe that Crowe 'has a lot to live with here; pleading guilty to this, and telling you from day one that he's the one that did it?' In fact, however, Crowe had testified at the suppression hearing in the sheriff's presence that he did not murder the victim and that his first two statements to the contrary were lies. Having asked, in essence, whether the sheriff was not of the opinion that [Petitioner's] admission of guilt 'from day one' was a mitigating factor, [Petitioner] cannot complain that it was error to allow the sheriff to give a truthful answer and explain his opinion. Once the door was opened by the questioning of the sheriff by [Petitioner's] counsel, the trial court correctly allowed the State to introduce the entirety of his suppression hearing testimony into evidence at the sentencing trial.

*Crowe,* 458 S.E.2d at 809.

Petitioner claims the state court was incorrect because admission of the statement "allows the state's desire to impeach the defendant to defeat the use immunity given to statements made in protection of a defendant's rights to due process and a constitutionally reliable sentencing trial." Petitioner's Brief, p. 32. Petitioner's argument is flawed.

Petitioner claims that a defendant's testimony in support of his claim that evidence, which the state obtained pursuant to an unlawful search, is not admissible against him to prove guilt or innocence. *Id.* This is an improper characterization of *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Simmons,* the defendant moved to suppress a suitcase found at his co-defendant's mother's home on the grounds that the police illegally seized it. The defendant testified at his suppression hearing that the suitcase was his in order to have standing to assert his Fourth Amendment claim. The state court used the defendant's testimony that he owned the suitcase to prove that he was guilty of the substantive offense—robbery. The Court held that a defendant's testimony that proves *his standing* to challenge the propriety of a search or seizure may not be used against

him at trial on the question of guilt or innocence. *Id.* at 390, 88 S.Ct. 967. The Georgia Supreme Court was correct in making this distinction in the instant action. *Crowe,* 458 S.E.2d at 809. Petitioner's suppression hearing testimony had nothing to do with his right to bring the instant claims and thus *Simmons* is not applicable.

Petitioner's reference to *Estelle,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, is equally unavailing. The *Estelle* Court stated that a state may not rely on un-warned statements a defendant makes in a competency hearing at trial. 451 U.S. at 463, 101 S.Ct. 1866. In the instant action, Sheriff Lee read Petitioner his *Miranda* rights before making his third statement and thus Petitioner was fully aware that his third statement could and would be used against him. Transcript from Nov. 16, 1989, p. 1355. Furthermore, Petitioner pled guilty prior to admission of the statement and thus the trial court's admission of the statement was not error.

Based on all of the above, Petitioner is not entitled to habeas relief for any of the claims the Georgia state courts reviewed on the merits. The same is true of Petitioner's 2002 habeas claims.

## V. Claims Barred by Georgia's Procedural Default Rule in 2000 State Habeas Petition

The January Order explained that this Court would also review Judge Towson's conclusions that several of Petitioner's claims were procedurally defaulted and that Petitioner had not shown "cause" for the default and "prejudice attributable thereto" or "demonstrate[d] that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Crowe,* 356 F.Supp.2d at 1350 (citing

*Crawford v. Head,* 311 F.3d 1288, 1327 (11th Cir.2002)).

■■■ Petitioner may show cause for failure to raise a claim by proving that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Ineffective assistance of counsel, the absence of the legal or factual basis of a claim, and "interference by officials" that make compliance impracticable are all sufficient grounds for "cause." *Id.* at 488, 106 S.Ct. 2639. As for prejudice, Petitioner "must show that the items of evidence were material; that is, that 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Wright v. Hopper,* 169 F.3d 695, 703 (11th Cir.1999) (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). Finally, "[i]n order to show the type of 'miscarriage of justice' that will excuse a procedural bar, a petitioner must make a colorable showing of actual innocence." *Isaacs v. Head,* 300 F.3d 1232, 1255 (11th Cir.2002), *cert. denied,* 538 U.S. 988, 123 S.Ct. 1805, 155 L.Ed.2d 683 (2003).[23] With these principles in mind, the Court reviews each of Petitioner's claims that Judge Towson held Petitioner procedurally defaulted.

### 1. Prosecutorial Misconduct

■ Petitioner asserts, as proof of prosecutorial misconduct, the prosecution's use of the Georgia Crime Information Center ("GCIC") reports during jury selection in order to identify jurors who had been charged with or convicted of crimes. The state habeas court held that Petitioner did not show cause for failure to raise the claim, as defined in *Murray,* and even if

---

**23.** In light of Petitioner's guilty plea, this Court will not review a procedurally defaulted claim on the basis that failure to do so would result in a fundamental miscarriage of justice

because Petitioner cannot make a "colorable showing of actual innocence." *Isaacs,* 300 F.3d at 1255.

Petitioner did show cause, the evidence did not support a finding of actual prejudice. Towson Order, p. 22.

Petitioner claims he did not realize the State used the GCIC reports until his Open Records Act request. He claims the State affirmatively withheld the information and thus he has shown "cause" for failure to assert the claim at trial or on direct appeal. Petitioner's Brief, p. 71. Even assuming Petitioner can show cause, his claim fails for a lack of prejudice.

Petitioner contends that jurors with pending charges against them "feared for the results of their own cases [and thus were] biased in favor of the state." *Id.* This conclusion is problematic, however, because Petitioner has not put forth any evidence to show that a single juror actually feared for his or her own case or even knew the prosecution used the GCIC reports. Petitioner's speculation is not sufficient to prove that, had the State not used the reports, "the result of the proceeding would have been different." *Wright,* 169 F.3d at 703.

2. Suppression of Exculpatory Evidence

Plaintiff alleges that the state improperly withheld several pieces of allegedly exculpatory evidence in violation of *Brady,*

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *Kyles,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490.[24] Before proceeding to the merits of Petitioner's *Brady* claim, Judge Towson held that the claim was procedurally barred.[25] Judge Towson accepted Petitioner's argument that there was cause for not presenting the claim in earlier proceedings—the State did not produce the documents until counsel made an Open Records Act request, even though earlier discovery requests should have produced the documents—however, he held that use of the documents was moot because of Petitioner's guilty plea.

This Court agrees that Petitioner established cause for the procedural default, yet failed to show prejudice, but for a different reason than Judge Towson. A *Brady* violation has three elements: (1) suppression by the prosecution (2) of exculpatory evidence (3) material to the issues at trial or sentencing. *Kennedy v. Herring,* 54 F.3d 678, 682 (11th Cir.1995). The materiality element is satisfied "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 667, 105 S.Ct. 3375. This

---

**24.** Petitioner's *Brady* claim addresses "(1) documents that trial counsel demonstrated were suppressed, and that were argued on direct appeal, and (2) documents that habeas counsel located pursuant to Open Records Act requests." Petitioner's Brief, p. 72.

As stated above, Petitioner's *Brady* claim with respect to the former group of evidence is without merit because counsel actually saw, or at least had the opportunity to see, the documents pursuant to the State's open file policy. *See* supra, p. 1341. Therefore, the following discussion pertains only to those records Petitioner received pursuant to his Open Records Act request.

**25.** The state habeas court lists all the pieces of evidence Petitioner claims were improperly suppressed. However, the state court did not address the evidence labeled "(1)," which was a report Major Phil Miller prepared on May 4, 1988 regarding his interview with Wickes employee Kendall Mark Kitchen about drug use and sales by Wickes employees on the store's premises. Failure to include the report appears to be a mere mistake. The court did not expressly find the claim procedurally defaulted; however, it did reject a similar report by Major Miller dated May 3, 1988 of his interview with a Wickes employee regarding drug use and sales by employees. Therefore, the absence of "(1)" from the state court's consideration is of no consequence.

Court finds that *Brady* prejudice may exist in a sentencing proceeding if there is reasonable probability that the withheld evidence would have changed the result of the sentencing proceedings—not merely the verdict.[26] *Kennedy,* 54 F.3d at 683 (ultimately rejecting petitioner's claim, but considering whether the improperly suppressed statements would have had an impact on his sentence). Petitioner claims that with the evidence, counsel would have been able to counter the State's aggravating version of the events surrounding the murder and thus the jury would not have voted unanimously for the death penalty. Petitioner's Brief, p. 76. However, even considering the evidence and its impact on the sentencing proceedings, this Court reaches a similar conclusion to the *Kennedy* court—the jury would have still sentenced Petitioner to death.

■ Petitioner was sentenced to death because the jury found that Petitioner committed murder "for the purpose of receiving money ... and that the murder was outrageously and wantonly vile, horrible, or inhuman in that it involved depravity of mind and an aggravated battery." *Crowe,* 458 S.E.2d at 813. None of the evidence Petitioner contends the jury should have seen refutes the jury's finding that Petitioner killed and then robbed Mr. Pala. Given the undisputed basis for at least one mitigating factor, the failure to

consider the improperly suppressed *Brady* evidence does not convince this Court that " 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Wright,* 169 F.3d at 703.

### 3. Juror Misconduct

■ Petitioner asserts three grounds of juror misconduct that he claims were not procedurally defaulted: premature juror deliberations, juror consideration of a bailiff's comments during trial, and juror consideration of evidence adduced during the jury's view of the crime scene.[27]

#### a. Premature Deliberations

Judge Towson rejected Petitioner's claim that the jury deliberated before the close of evidence and jury charge. Petitioner offered juror affidavits that stated otherwise; however, Judge Towson refused to consider the affidavits because he found that the evidence was available at the time of the extraordinary motion for new trial[28] and they did not show ineffective assistance of counsel for cause to excuse the default. Towson Order, p. 27. Judge Towson also refused to review the juror affidavits because doing so would violate Georgia's "impeachment of the verdict rule." *Id.* Petitioner claims that Judge Towson should have admitted the affidavits; however, this Court agrees with Judge Towson's conclusion[29] and reminds

---

**26.** Above, Petitioner contends that the *Brady* evidence would undermine the verdict in the proceedings. *See* supra, pp. 1341–1343. As explained supra, Petitioner pled guilty and thus the suppressed evidence, regardless of its nature or strength, would not have impacted the verdict.

**27.** Petitioner also claims the jury improperly considered evidence adduced during the crime scene reenactment at Wickes Lumber; however, as explained below, the Court defers to Judge Towson's conclusion that a reenactment did not occur. *See* infra, pp. 74–76.

**28.** Judge Towson's finding that the evidence was available at the time of the extraordinary motion for new trial is a factual determination. *See Amadeo v. Zant,* 486 U.S. 214, 223, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Pursuant to 28 U.S.C. § 2255(e)(1), this Court must defer to that finding unless Petitioner puts forth clear and convincing evidence otherwise.

**29.** Georgia's rule against the use of juror affidavits to impeach the verdict is similar to Federal Rule of Evidence 606, which prohibits jurors from testifying "as to any matter or statement occurring during the course of the

Petitioner that review is limited to whether he can show cause and prejudice for failure to assert his juror misconduct claim on appeal.[30]

Petitioner relies on *Turpin v. Todd*, 268 Ga. 820, 493 S.E.2d 900 (1997), for the proposition that unless evidence during trial alerts counsel to the presence of misconduct by the jury, counsel does not have a duty to investigate jury conduct before the conclusion of direct appeal and thus Petitioner has cause for failing to raise the claim on appeal. Petitioner's Brief, p. 78. Even if this Court agreed with Petitioner that he has sufficient cause for failure to raise the claim, this Court is confident that any such deliberation was not prejudicial. Even if jurors did discuss Petitioner's case prior to the jury charge, which is far from certain,[31] this error did not work to his "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Therefore, alleged

early jury deliberation is not grounds for habeas relief.

**b. Bailiff's Comment**

The same is true of Petitioner's claim that the bailiff made improper statements about defense counsel's motivations during trial. Petitioner contends that the bailiff told jurors that defense counsel was seated in order to prevent jurors from seeing Petitioner during trial. Towson Order, p. 27. Judge Towson found that the evidence was available at the time of the extraordinary motion for new trial and that it did not show ineffective assistance of counsel for cause.[32] *Id.* at 27–28. Assuming, without deciding, that Petitioner has cause for not asserting the claim on direct appeal, the affidavits do not show prejudice sufficient to undermine the outcome of the case. Juror Tena Mahs simply explained that the bailiff told the jury that "defense attorneys will purposely block the jury's view of the client if the client is not going to testify." Mahs Affidavit, p. 2. The bailiff did not say that Petitioner's counsel was

---

jury's deliberations ..." Fed.R.Evid. 606(b). The exceptions—extraneous prejudicial information or outside influences—are not at issue with respect to Petitioner's premature deliberation claim.

**30.** As stated above, this Court will only review the state court's decision to ensure that it was not contrary to, or involved an unreasonable application of, clearly established *federal* law, or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d) (emphasis added).

**31.** Even if this Court did consider the affidavits, Petitioner would not be entitled to relief.

Petitioner claims Juror Tena Mahs's affidavit establishes prejudice; however, Mahs's affidavit is unreliable. She states that after "all the evidence had been presented, but before closing arguments," the jurors discussed the case. Mahs Affidavit, p. 2. She then explains that the next day, the "lawyers or [ ] witnesses" answered any remaining questions not resolved the night before during their

discussion. *Id.* If the jurors discussed the case at the close of all the evidence, but before closing arguments, how could their questions have been answered by witnesses the following day?

The Court does not question Juror Mahs's veracity, rather notes that she gave her sworn affidavit almost seven years after serving on Petitioner's jury. Given this inconsistency, the Court finds that Juror Mahs's affidavit alone does not show that Petitioner was prejudiced by Judge Towson's refusal to consider his juror misconduct claim.

**32.** Unlike Petitioner's premature deliberation claim, Judge Towson considered the juror affidavits in support of Petitioner's claim that the bailiff made improper statements. Like Federal Rule of Evidence 606, Georgia law permits consideration of juror affidavits that raise the issue of extra-judicial communication presented outside the presence of the defendant or his counsel. *See Williams v. State*, 255 Ga.App. 177, 564 S.E.2d 759, 763 (2002).

purposely blocking the jury's view, nor did Juror Mahs say that the statement affected her recommended sentence of death.

The statements in the instant action are entirely different than those sufficient to show cause in *Turpin*, 268 Ga. 820, 493 S.E.2d 900 (finding cause where petitioner's counsel had no way of knowing that the bailiff told jurors that petitioner would be eligible for parole in seven (7) years if the jury sentenced him to life in prison). The bailiff's statement, even if true, did not work to Petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 907 (citing *Frady*, 456 U.S. at 170, 102 S.Ct. 1584).

### c. Alternate Jurors

Finally, Petitioner asserts that alternate jurors improperly participated in jury deliberations. The habeas court found the alternate jurors did not, in fact, participate. Towson Order, p. 28. Pursuant to 28 U.S.C. § 2254(e), such factual determinations are presumed to be correct. Petitioner has not put forth clear and convincing evidence otherwise.[33]

### 4. Trial Counsel's Conflict of Interest

Petitioner next claims error due to trial counsel's conflict of interest. The state court found Petitioner procedurally defaulted the claim. Petitioner notes that the same counsel, Michael Bergin, represented him at trial, at the extraordinary motion for new trial hearing, and on direct appeal. Therefore, he argues that he raised the conflict of interest claim at the first possible time, which was his post-conviction proceedings. This Court agrees. *See Stephens v. Kemp*, 846 F.2d 642, 651 (11th Cir.1988) ("We find 'cause' for petitioner's failure to raise the ineffective assistance issue in his first state habeas petition in the fact that petitioner's trial counsel, whose effectiveness is here challenged, also represented him in the first state habeas proceeding."). However, as discussed above, Petitioner's counsel did not operate under a conflict of interest that resulted in ineffective assistance of counsel under *Strickland* and thus Petitioner cannot show prejudice to overcome the procedural bar. *See* supra, pp. 1324–1326.

### 5. Reenactment of the Crime and View of the Crime Scene

Petitioner's contention that the jury considered non-record evidence when the State reenacted the crime at Wickes Lumber is without factual support. *See* supra, pp. 1326–1327. Petitioner offers juror affidavits that state a reenactment, in fact, did occur at Wickes Lumber Store.[34]

---

**33.** *See* supra, p. 1346 n. 28.

**34.** Petitioner's Amended Habeas Petition claims that the reenactment included an unconstitutional simulation of evidence in violation of *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (finding that state's reliance on "bloody shorts," which were actually stained by paint, violated the Fourteenth Amendment). Petitioner does not contend that the State relied on similarly egregious and false facts.

Petitioner's reliance on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) is also misplaced. In *Gardner*, the Supreme Court held that petitioner was denied due process when the trial court judge imposed a death sentence on the basis of confidential information that defendant could not explain or deny because it was not disclosed to defendant or his counsel. The alleged crime reenactment in the instant matter is of a wholly different nature considering the fact that Petitioner and counsel were present. Judge James, counsel for the State, Mr. Fite, the clerk of court, the court reporter, sheriff's department officers, and bailiffs were also present at the crime scene. *See* Transcript from Nov. 14, 1989, p. 1010.

Judge Towson refused to consider the affidavits because doing so would violate Georgia's rule against impeaching the jury's verdict; "affidavits of jurors may be taken to sustain but not to impeach their verdict." O.C.G.A. §§ 9–10–9 & 17–9–41. The exception to the rule is when affidavits would show that "extrajudicial and prejudicial information has been brought to the jury's attention improperly, or where non-jurors have interfered with the jury's deliberations." *Gardiner v. State,* 264 Ga. 329, 444 S.E.2d 300, 303 (1994) (internal citations omitted).

Judge James also specifically precluded the State from reenacting the crime at the jury's viewing of the scene, *see* Transcript from Nov. 14, 1989, p. 1004, and Judge Towson found that the affidavits did not, in fact, reveal presentation of extra-judicial evidence that Petitioner or counsel were not aware of. *See Crowe v. Turpin,* Order Regarding Respondent's Motion in Limine, No. 96–V–742, (Superior Court of Butts County Dec. 15, 1998). This factual finding, like the others above, is presumed correct pursuant to 28 U.S.C. § 2254(e), and Petitioner's presentation of the same affidavits, which directly contradict the trial transcript[35] and Judge James's instructions, is not clear and convincing evidence otherwise. Therefore, this Court defers to Judge Towson's decision not to consider the affidavits in support of Petitioner's claim.

The Court also notes that Georgia's rule against impeaching the jury's verdict is similar to Federal Rule of Evidence 606(b), which states, "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . .

except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed.R.Evid. 606(b). In light of the factual conclusion that extraneous prejudicial information was not brought to the jury's attention, any claim that Judge Towson's refusal to consider the affidavits was improper is rebutted by the Federal Rules, which require the same refrain.

For these reasons, Petitioner's request for an evidentiary hearing to consider the same affidavits is denied.

6. Errors in Jury Selection

According to Petitioner, the trial court failed to question jurors regarding possible arrests for, or conviction of, crimes, which it would have done had the prosecution revealed the GCIC results. Petitioner's Brief, p. 88. The habeas court found that Petitioner defaulted his claim and did not show cause and prejudice or a miscarriage of justice to excuse the default. Again, as required by *Murray,* Petitioner has not asserted the existence of "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." 477 U.S. at 488, 106 S.Ct. 2639. Petitioner has wisely refrained from arguing that the State withheld evidence of the juror's criminal history.[36] Nothing prevented counsel himself from questioning the jurors about their criminal history or requesting copies of the GCIC reports. The habeas court was correct that the factual and legal basis for

---

35. The transcript, which includes the jury's visit to Wickes Lumber, does not reflect the acts which the juror affidavits include.

36. *Williams v. State,* 255 Ga.App. 177, 564 S.E.2d 759, 761 (2002) ("[C]ounty prosecutors[ ] are allowed to obtain the GCIC reports of potential jurors and to use them to determine whether they are convicted felons. . . . Defense attorneys . . . are not authorized to receive the GCIC reports on potential jurors without the express written consent or the fingerprints of the jurors.").

objection were available to counsel, there was no " 'interference by officials,' " and nothing made "compliance impracticable." *Id.* (citing *Brown v. Allen*, 344 U.S. 443, 486, 73 S.Ct. 397, 97 L.Ed. 469 (1953)). Therefore, his claim of error during jury selection does not entitle Petitioner to habeas relief.

### 7. Improper Jury Instructions

Finally, Petitioner claims the trial court's jury instructions regarding reasonable doubt and the unanimity requirement for mitigating factors were erroneous. Petitioner's Brief, p. 89. The habeas court, again, found Petitioner defaulted the claims because the basis for objection was clearly available on appeal, and Petitioner did not show cause and prejudice or a miscarriage of justice to excuse the default. Towson Order, p. 30.

Petitioner admits that counsel should have raised all possible jury instruction errors at trial and on direct appeal; however, he claims that counsel's failure to do so is proof of ineffective assistance of counsel, which is "cause" for failure to assert the claim on direct appeal. Petitioner cites to *Brown v. United States*, 167 F.3d 109 (2d Cir.1999), for the proposition that failure to object to obviously deficient jury instructions can establish cause pursuant to *Strickland.* Petitioner's Brief, p. 92. Petitioner fails to put forth any binding precedent to the same effect. Furthermore, *Brown* is distinguishable from the instant action.

The trial court judge in *Brown* told the jury,[37] "[t]he law does not require proof that overcomes all possible doubt. So *a reasonable doubt means only a substantial doubt* .... Should the prosecution fail to prove the guilt of the defendant beyond a reasonable doubt, you *may* acquit the defendant on the basis of the presumption of innocence." *McKee v. United States*, 167 F.3d 103, 105 (2d Cir.1999). The court held that the instruction was "clearly" and "obvious[ly]" "constitutionally deficient." *Brown*, 167 F.3d at 110 (citing *Bloomer v. United States*, 162 F.3d 187 (2d Cir.1998) (same instructions)).

■ In Petitioner's case, Judge James stated, "the State is not required to prove the existence of an aggravating circumstance beyond all doubt, or to a mathematical certainty. Proof to a moral and reasonable certainty is all that can be expected in a legal investigation." Transcript from Nov. 18, 1989, p. 1877. Unlike *Brown*, this instruction was not "obviously deficient" because it did not equate reasonable doubt with substantial doubt. *See McKee*, 167 F.3d at 107. Also, Judge James went on to explain:

> What is meant by the term 'reasonable doubt?' Reasonable doubt means just what it says. It is a doubt based upon common sense and reason. It is a doubt which arises in the mind of a fair-minded, impartial juror honestly seeking the truth after considering the evidence, or a lack of evidence, or a conflict in the evidence or a combination of these factors.

Transcript of Nov. 18, 1989, p. 1877. Therefore, Judge James's charge was not "constitutionally deficient" and thus *Brown* is not as persuasive as Petitioner contends.

Furthermore, as explained in *Frady,* a prisoner seeking collateral relief for errors in the jury charge must show that " " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.' " " 456

---

**37.** The Second Circuit actually did not state what the jury instructions were in Brown's case; however, it referred to *McKee*, 167 F.3d 103, which involved instructions "in all material respects, identical to those considered by this Court." *Brown*, 167 F.3d at 110.

U.S. at 169, 102 S.Ct. 1584 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)). Petitioner has made no such showing.

Judge James's instruction with respect to mitigating factors was also proper. He stated:

> [y]ou may set the penalty to be imposed at life imprisonment, based upon any mitigating or extenuating facts and circumstances. However, it is not required and is not necessary that you find any extenuating or mitigating fact or circumstance in order for you to return a verdict setting the penalty to be imposed at life imprisonment. In other words, whether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment.... Now, whatever your verdict is as to the penalty, it must be unanimous.

Transcript from Nov. 18, 1989, p. 1883.

Petitioner claims these instructions were inaccurate because Judge James failed to explain to the jury that they were not required to reach a unanimous determination with respect to the mitigating factors. Petitioner's Brief, p. 90. Petitioner is incorrect. In Georgia, "any 'verdict' rendered must be unanimous ... [and] the trial court is not required to instruct the jury that lack of unanimity forecloses imposition of the death penalty." *Legare v. State*, 250 Ga. 875, 302 S.E.2d 351, 354 (1983). Therefore, Judge James's instruction was proper.

## VI. Claims Raised in 2002 Habeas Petition

This Court's January Order determined that Judge Smith's dismissal of three of Petitioner's claims was subject to this Court's review. *Crowe*, 356 F.Supp.2d at 1347. Those claims were (1) Petitioner was sentenced to death under a statute which was declared unconstitutional, so his death sentence is null and void and, if carried out, would violate his rights under the Georgia and United States Constitutions; (2) execution by lethal injection is cruel and unusual punishment; and (3) the lack of a uniform standard in Georgia for seeking the death penalty renders Petitioner's death sentence unconstitutional under *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). *Crowe*, 356 F.Supp.2d at 1347. Petitioner's Brief only reasserts the merits of the second and third claims and thus the first—Petitioner was sentenced to death under a statute which was declared unconstitutional, so his death sentence is null and void and, if carried out, would violate his rights under the Georgia and United States Constitutions—is dismissed with prejudice.

### 1. Cruel and Unusual Punishment

█ Petitioner claims that Georgia's administration of the death penalty via lethal injection is cruel and unusual punishment in violation of the Eighth Amendment. Judge Smith rejected the claim based on the Georgia Supreme Court's conclusion that lethal injection is a "less painful, less barbarous means" than electrocution. Smith Order, p. 2 (citing *Dawson v. State*, 274 Ga. 327, 554 S.E.2d 137, 144 (2001)). Petitioner claims this conclusion was an unreasonable factual determination and/or application of Federal law under 28 U.S.C. § 2254(d). Respondent rejects Petitioner's contention and notes that Georgia has unequivocally stated that death by lethal injection is not unconstitutional.[38] *See Riley v. State*, 278 Ga. 677,

---

**38.** Respondent also argues that Petitioner is seeking relief from his penalty of death—not the method in which the State will presumably carry out this sentence—and thus his challenge is without merit. The Court rejects Respondent's position.

The Supreme Court has explained, "imposition of the death penalty presupposes a means

604 S.E.2d 488, 499 (2004); *Dawson,* 274 Ga. 327, 554 S.E.2d 137.

The Eighth Amendment's prohibition against cruel and unusual punishment bars punishment that involves "something more than the mere extinguishment of life." *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). Petitioner has not put forth any applicable federal or state law that concludes execution by lethal injection violates the Eighth Amendment.

Despite the lack of case law, Petitioner claims that evidence submitted to this Court proves that lethal injection is cruel and unusual punishment. Petitioner's Brief, p. 52. Consideration of this evidence, however, is improper. According to § 2254(e)(2), [i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that -

(A) the claim relies on -

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of reasonable diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Petitioner claims he was "never permitted to present his evidence" regarding this claim. Petitioner's Brief, p. 95. Judge Smith's Order did not mention the evidence and thus this Court assumes that he refrained from considering it. Because Petitioner has developed the factual basis of this claim, or at least attempted to do so, § 2254(e)(2) may not preclude his request for an evidentiary hearing. Petitioner cannot be faulted for allegedly failing to develop the record when, in fact, he did so. *See Williams,* 529 U.S. at 436–37, 120 S.Ct. 1479 ("[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort."); *Cardwell v. Greene,* 152 F.3d 331, 337 (4th Cir.1998); *Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir.1998); *Rodriguez v. Zavaras,* 42 F.Supp.2d 1052, 1055 (D.Colo.1999). Therefore, Petitioner has satisfied § 2254(e)'s first prong.

An evidentiary hearing is still not appropriate, however, unless Petitioner can also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).[39] Here, Petitioner's guilt is not in question given his valid guilty plea; however, this does not automatically bar him from relief. This Court has held

of carrying it out.... [If the State] has established lethal injection as the preferred method of execution ... a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself." *Nelson v. Campbell,* 541 U.S. 637, 644, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004).

**39.** Petitioner wisely refrains from attempting to rely on § 2254(e)(2)(A)(i), which entitles Petitioner to an evidentiary hearing if his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(e)(2)(A)(i).

that a petitioner may be entitled to an evidentiary hearing if he satisfies § 2254(e)(2)(A) and shows that " 'the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have [recommended the death penalty for him.]' " *Housel v. Thomas,* No. 1:94–CV–1444–ODE, 1997 WL 67823 (N.D.Ga. Feb. 11, 1997).

■■■ Applying this standard, Petitioner is still not entitled to an evidentiary hearing on his claim that lethal injection, as administered in Georgia only, is cruel and unusual punishment. Petitioner attempts to support his claim by submitting the entire record that was before Gwinnett County Superior Court Judge Michael C. Clark in a state case challenging the constitutionality of the defendant's death sentence.[40] The evidence adduced included testimony from individuals that participated in lethal injections in Georgia, including the president of the Medical College of Georgia, an anesthesiologist that reviewed the records and protocols of Georgia's first six lethal injections, and a pathologist who performed autopsies on the first six subjects; Georgia Department of Corrections ("DOC") lethal injection protocols, information about the equipment used, and DOC records from the first six lethal injections; evidence that Pentothal, the first drug injected into the prisoner, rapidly induces unconsciousness, but sensitivity to Pentothal varies among individuals and thus the required one gram may not be enough to induce complete unconsciousness in some; evidence that in previous lethal injections, the execution staff allegedly deviated from and/or was not familiar with the protocol; a claim that Pavulon, which paralyzes the muscles, is not necessary to bring about death, rather is used only to prevent "unpleasant" twitching before death; evidence of complications in previous executions and speculation that potential problems could arise during the procedure; evidence that the State is not keeping accurate records of the executions and how much medicine staff is administering and thus it is impossible to know whether there is a risk of inflicting unnecessary and severe pain and suffering; Georgia DOC Lethal Injection Procedure and records of another five completed lethal injections; a study by Dr. Leonidas G. Koniaris that 43% of prisoners in Georgia, South Carolina, North Carolina, and Arizona had thiopental[41] concentration levels consistent with consciousness, meaning that prisoners may experience asphyxiation, severe burning sensations, massive muscle cramping, and cardiac arrest; and finally, autopsy and toxicology reports of the last four prisoners executed, which allegedly show that thiopental concentration in the blood was significantly below what is required to properly anesthetize a person.

After considering Petitioner's proffer, and taking into account the evidence offered by the State at the hearing, the Court finds ' that having an evidentiary hearing would not be helpful. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Here the majority of Petitioner's evidence is speculative in nature. Also, in *Nance,* the State rebutted the defendant's evidence that sodium pentothal levels of executed prisoners were consistent with consciousness at the time

---

**40.** Judge Clark rejected the petitioner's claim, finding that the one gram dosage of sodium pentothal is five times the amount needed to induce unconsciousness. *State v. Michael Wayne Nance,* Indictment No. 95–B–2461–4 (Gwinnett County Superior Court Sept. 3, 2002), *appeal docketed,* No. S05P1438 (Ga. Apr. 11, 2005).

**41.** Thiopental apparently is synonymous with Pentothal.

of lethal injection. Dr. Kris Sperry, chief medical examiner for the State of Georgia, testified that "these inmates were essentially dead ... well prior to the termination of ... the injection of the sodium Pentothal." Transcript from July 30, 2002, p. 37. He further testified that by the time they died, "[t]hey [were] completely unconscious and insensate to pain." *Id.* Dr. Sperry's testimony also casts doubt on Dr. Koniaris's report, which, by Dr. Koniaris's own admission, lacks reliability: "Extrapolation of antemortem depth of anaesthesia from post-mortem blood thiopental concentrations is admittedly problematic." Dr. Leonidas G. Koniaris, et al., 365 *The Lancet* 1412, 1413 (Apr. 16, 2005). Even assuming Petitioner could show that some prisoners may experience pain and suffering, the rapidity with which death ensues is persuasive. Considering all the evidence proffered to the Court, Petitioner would not be able to show that Georgia's use of lethal injection as a means of execution is "unnecessary and wanton infliction of pain," *id.*, and thus Petitioner's request for an evidentiary hearing with respect to his claim that lethal injection violates the Eighth Amendment is denied.

Without case law or evidentiary support, this Court must deny Petitioner's claim that execution by lethal injection is cruel and unusual punishment.

### 2. Equal Protection Violation

██ Georgia's application of the death penalty is allegedly a violation of *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), which, according to Petitioner, held that when a fundamental right is at stake, due process requires states to have "uniform and specific" standards to prevent the arbitrary and disparate treatment of similarly-situated citizens. Petitioner's Brief, p. 61. Judge

Smith held that Petitioner's claim was without merit. Smith Order, pp. 3–4.

Petitioner's argument is creative but not persuasive. In order to establish his claim, Petitioner must show that Georgia's alleged lack of "uniform and specific" standards "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (citing *Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)) ("[I]t is normally 'within the power of the State to regulate procedures under which its laws are carried out,' ... and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' "). Petitioner's reliance on *Bush* does not establish as much.

In *Bush,* the Supreme Court rejected the Florida Supreme Court's attempt to determine the "intent of the voter" without uniform rules about how to determine as much. 531 U.S. at 105–06, 121 S.Ct. 525. Whether or not a Presidential ballot was counted varied from county to county and "within a single county from one recount team to another." *Id.* at 106, 121 S.Ct. 525. Without any objective criteria, each county and each recount team could potentially apply a different standard in defining a legal vote, resulting in arbitrary and disparate treatment of voters. *Id.* at 105, 121 S.Ct. 525. The Court's overriding concern was the lack of "sufficient guarantees of equal treatment." *Id.* at 107, 121 S.Ct. 525.

Petitioner claims that the Court's holding in *Bush* is analogous to the instant action.[42] However, no similar risk of un-

---

**42.** Petitioner claims that *Bush* has been extended to non-voting cases; however, his reference to two dissenting opinions and a case

equal treatment is involved by the prosecutor's pursuit of the death penalty in Georgia. This Court disagrees with Petitioner's claim that Georgia prosecutors have "unbridled prosecutorial discretion over the question of when to seek the death penalty," which resulted in unequal treatment of Petitioner. Petitioner's Brief, p. 62.

It is true that Georgia prosecutors have discretion to seek the death penalty; however, "[d]iscretion is essential to the criminal justice process [and thus] we would demand exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey v. Kemp*, 481 U.S. 279, 297, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987):

> [T]he policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.' ... Moreover, absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States and Georgia laws permit imposition of the death penalty.

*Id.* at 296–97, 107 S.Ct. 1756. Here, Petitioner pled guilty to murder and armed robbery, therefore, the prosecutor's decision to seek the death penalty was consistent with Georgia law and was not arbitrary.

In fact, the Supreme Court expressly upheld Georgia's system of imposing the death penalty and rejected the defendant's claim that the system was unconstitutional given a prosecutor's "unfettered authority to select those persons whom he wishes to prosecute for a capital offense." *Gregg*,

428 U.S. at 199, 96 S.Ct. 2909. In *Gregg*, the Court upheld Georgia's death penalty scheme because Georgia limits the risk of arbitrary and capricious action by bifurcating the sentencing proceeding, requiring a finding of at least one aggravating circumstance, allowing the defendant to introduce mitigating evidence, requiring an inquiry into the circumstances of the offense and the propensities of the offender, and providing for automatic, mandatory appeal. The Court also explained:

> [T]he existence of [ ] discretionary stages is not determinative of the issue ... At each of these stages an actor in ·the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty.... Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.... In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities change a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant.... Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today.

*Id.* at 199–200 n. 50, 96 S.Ct. 2909. *See also Proffitt v. Florida*, 428 U.S. 242, 253, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (rejecting petitioner's contention that the Florida death penalty system is arbitrary because the prosecutor decides whether to charge a capital offense and accept or reject a plea to a lesser offense).

As explained, Georgia has various procedures in place to ensure the propriety, to the extent possible, of a death sentence. To the extent that any risk to the contrary exists, Georgia's appellate review mini-

---

about attorney's fees is unpersuasive. Petitioner's Brief, pp. 62–63.

mizes the risk. *See Proffitt*, 428 U.S. at 253, 96 S.Ct. 2960. *See also McCleskey*, 481 U.S. at 313, 107 S.Ct. 1756 (citing *Singer v. United States*, 380 U.S. 24, 35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965)) ("Constitutional guarantees are met when 'the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible.' ").

In rebuttal, Petitioner cites numerous other murder cases where the defendant did not receive a death sentence. However, Petitioner's efforts were unnecessary; the state supreme court already determined that Petitioner's death sentence "is not excessive or disproportionate to penalties imposed in similar cases," *Crowe*, 458 S.E.2d at 813, as required by O.C.G.A. § 17–10–35(c)(3) ("With regard to the sentence, the court shall determine ... whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant."). The Court defers to this factual determination because Petitioner has not put forth clear and convincing evidence to show the state court was incorrect. *See* 28 U.S.C. § 2254(e)(1).

Petitioner requests an evidentiary hearing to have this Court consider further evidence in support of his claim; however, similar to his Eighth Amendment claim above, a hearing to consider such evidence is not warranted. This Court's January Order told Petitioner that in order to consider new evidence, he should state "with a high level of specificity, what the evidence is." *Crowe*, 356 F.Supp.2d at 1352. Petitioner has submitted evidence; however, it is not promising enough to warrant an evidentiary hearing.

The proffered evidence includes a compilation of one hundred (100) murder cases in Georgia where the defendant did not receive the death penalty; murder case statistics from the Alcovy Judicial District and Newton and Walton Counties which show whether the prosecutor sought the death penalty; the 1977 deposition testimony of Dennis York, special assistant to the Georgia Supreme Court in charge of maintaining records necessary for the Court's proportionality review; Amy G. Donella's affidavit, which recounts her largely unsuccessful attempt to gather information about Georgia's district attorneys' methods of seeking the death penalty; the affidavit of Sherod Thaxton, the multi-county public defender's statistician and monitor of death penalty cases, which says nothing about district attorneys' use of the death penalty in Georgia; and evidence of the death sentencing and penalty trial rates among New Jersey death eligible cases. This evidence, separately and cumulatively, does not come anywhere near proving that prosecutorial discretion in Georgia violates the Due Process Clause. Therefore, Petitioner's request for an evidentiary hearing is denied.

VII. Conclusion

Based on the foregoing, this Court DENIES Crowe's Petition for Writ of Habeas Corpus.